HEARD APRIL TERM, 1871.

DABNEY, MORGAN & CO., *vs.* BANK OF THE STATE OF SOUTH CAROLINA.

The State being the owner and sole stockholder of the Bank of the State of South Carolina, a moneyed corporation with the usual banking powers, and wishing to borrow money, passed, in June, 1838, an Act for that purpose, and thereby directed the money when borrowed to be deposited in the bank, as so much additional capital thereof, and directed the bank to keep a separate account of the annual profits of such additional capital, to constitute a fund "solemnly pledged and set apart" for the payment of the interest on the loan and the final redemption of the principal. The other profits of the bank were also pledged for the same purpose, after certain specified claims thereon, since paid, should be satisfied. A portion of the money was borrowed on bonds of the State, guaranteed by the bank, and known as the Fire Loan Bonds, and the residue on stock of the State, known as the Fire Loan Stock. The bank neglected to keep a separate account of the profits, and afterwards became insolvent, its assets being insufficient to pay its debts, evidenced principally by its guaranty of the Fire Loan Bonds, the bills of the bank, and its deposits: *Held*, That the assets on hand were not subject to the lien created by the Act in favor of the holders of the Fire Loan Bonds and Fire Loan Stock, but were subject to distribution among all the creditors of the bank, *pari passu.*

Though a pledge, or assignment, of profits in general carries the *corpus*, or capital, which produces the profits, yet, such is not the case where the intention is clear that such *corpus*, or capital, shall not be affected by the pledge, or assignment.

A bank incorporated for the benefit of the State, of which the State is the sole stockholder, and for whose debts the State is liable, has the same rights, and is subject to the same obligations, so far as creditors are concerned, as a bank whose stockholders are private individuals.

Where the assets of an insolvent bank are insufficient to pay its debts, such assets represent neither the capital nor the profits of the bank.

The guaranty of the Fire Loan Bonds, though not directed by the State, was nevertheless within the scope of the powers of the bank as a banking corporation, and was a valid and binding contract.

In 1865, the State passed an Act authorizing and requiring the bank, then known to be insolvent, to collect its assets and property, and hold the same " specifically appropriated," to the payment, (1) of the Fire Loan Bonds, (2) of the Fire Loan Stock, and (3) of the bills of the bank. In 1868, and before any appropriation of the assets and property was made by the bank, the State passed another Act repealing the Act of 1865: *Held*, That the Act of 1865 amounted, *proprio vigore*, neither to an assignment of the assets and property of the bank, nor created a lien thereon for the benefit of the classes of creditors named, but merely authorized the bank, as agent of the State, to make the appropriation, and that such agency was revocable, and had been revoked by the Repealing Act of 1868.

The bank being insolvent, and its assets insufficient to pay its debts, the State had no power to appropriate the assets to the payment of the Fire Loan Stock, that being a debt for which the Bank was not liable—*semble*.

The assets of an insolvent bank are a trust fund for the payment of its creditors, whether as guarantees, bill holders, depositors, or otherwise, and if there is no lien on the fund, the distribution among the creditors must be *pari passu*, and until the creditors are fully satisfied there is nothing which the stockholder, whether a private individual or a sovereign State, has the right to dispose of or appropriate to his own use.

*Bona fide* holders of the bills of an insolvent bank, hold them as against the bank, at their face value, no matter at what price they were purchased.

In the absence of a special contract to the contrary, a deposit of money in a bank vests the title in the bank, and the depositor becomes a creditor of the bank to the amount of the deposit.

In the absence of a special contract varying the rights of the parties, depositors of Confederate currency in a bank, are entitled to be paid in lawful money only so much as the currency was worth at the time of the deposit in such money.

The capital of an incorporated bank being a trust fund for the payment of its debts, if it be withdrawn by the stockholder, even though a sovereign State, is held after such withdrawal, subject to the trust.

When a sovereign State becomes a voluntary party to a suit in its own Court, it may be informed and advised by the judgment of the Court, as to its rights and obligations, though such judgment cannot be enforced against it, by the process of the Court.

Under a bill to wind up the affairs of the Bank of the State of South Carolina, the billholders have no equity to compel the holders of the Fire Loan Bonds, guaranteed by the bank, to show that their claims against the State on the bonds, will be delayed or denied, nor have they any equity to be subrogated to the rights of such bondholders against the State—the latter being liable, by the terms of the bank charter, for all the debts of the bank, no matter how contracted.

BEFORE CARPENTER, J., AT CHARLESTON, MAY TERM, 1870.

This was a creditor's bill filed for the purpose of having the affairs of the defendant, an insolvent bank, wound up under the decree and orders of the Court. A Receiver was appointed, and creditors called in to prove their claims. The case was heard in the Circuit

Court, upon the report of a Referee, setting forth, at length, what orders and other proceedings had been had in the case, what amount of assets were in the hands of the Receiver, and what claims against the bank had been proved. The case will be understood from the judgment of this Court, and the decree of the Circuit Judge, which is as follows:

CARPENTER, J. The bill in this case was filed by Messrs. Magrath & Lowndes, Solicitors for Dabney, Morgan & Co., on the 30th day of October, 1867, in the Court of Equity of this State under the laws then existing.

The bill sets forth in substance the charter of the Bank of the State of South Carolina, adopted by the Legislature of South Carolina, in the year 1812; the election by the Legislature of the President and Directors of the bank so created, and the acceptance by them of the charter; the supply of capital by the State, and the fact of the issuance, from time to time, of notes or bills of the bank, redeemable in specie. It sets forth that the bank is insolvent, and claims in the alternative, first, that the capital and all the assets and property of the bank are primarily liable to the holders of the bills issued, and that these billholders are entitled to payment in full before the claims of other creditors can be considered; or, failing in this, secondly, that billholders are entitled to share the assets or property of the bank, *pari passu*, with other creditors. It refers to the Act of 1838, for rebuilding the city of Charleston, and recites the 10th, 11th and 12th Sections of said Act. The bill further charges, that the two millions of dollars added to the capital of the bank by the loan effected under the Act of 1838, are subject to the same conditions with the original capital. It denies that the holders of the fire loan bonds and stock are properly creditors of the bank at all under the Act of 1838, or, if they be creditors, that they are entitled to any preference over other creditors, and, least of all, to any preference over billholders. It further charges that the 11th Section of the Act of 1865, directing that the assets of the bank be held "especially appropriated, first, to the principal and interest of the bonds known as the fire loan bonds payable in Europe; second, to the payment of the principal and interest of the fire loan bonds payable in the United States; and, third, to the redemption of the outstanding notes hitherto issued by said bank," is unconstitutional and void; first, as impairing the obligation of the contract raised by the charter of 1812; second, as violating the Bankrupt Act passed by Congress in 1867. The bill then prays that the

"President and Directors of the Bank," as a corporation, and Charles M. Furman and Thomas R. Waring, as individuals, answer the premises, and that they account for the capital, assets and property in their possession ; and it further prays that the Court take possession of said capital, assets and property, and distribute the same among the creditors, but claiming priority in such distribution for the billholders.

On the 3d day of February, 1868, the President and Directors of the Bank of the State of South Carolina, by their solicitors, Hayne & Son, filed their answer to the bill.

The answer admits the adoption of the charter of 1812, its acceptance, the receipt of the original capital from the State by the bank, and the issuance by it, from time to time, of bills or notes, made payable in gold or silver coin, and that the holders of the bills are creditors. The answer denies that the billholders are *preferred* creditors, or that the present holders of the bills issued received such bills "as money," or "in the expectation or hope that they would be paid in coin;" but it alleges that these bills or notes were bought on speculation, and after the insolvency of the bank, and with a full knowledge of this insolvency. The answer further alleges that, (if the bank be insolvent, as alleged by complainants, and the assets insufficient to pay all indebtedness,) when said assets are to be distributed by the Court of Equity, the billholders, as creditors, can rightfully claim only in proportion to the amount actually paid for the bills. The answer further alleges, that the billholders, as well as other general creditors, are, in fact, postponed to the two first named classes of creditors, to whom preference was given by the Act of 1865. It claims that a lien was created by the Act of 1838 in favor of these classes; but that, even if the "pledges" contained in the Act of 1838 do not constitute a "*lien,*" giving them a priority to the exclusion of other creditors, that Act certainly constitutes these classes, to wit: the fire loan bondholders in Europe, and the fire loan stockholders in America, "creditors" of the bank. The answer refers to the endorsement on the bonds by the President of the bank, guaranteeing, in the name of the bank, the payment of principal and interest, in proof that these preferred classes were creditors, and creditors having peculiarly strong claims both on the State and on the bank. The answer further alleges, that the bondholders and stockholders being *bona fide* creditors, the bank was, under the then existing laws, authorized at its discretion, to assign its effects for the benefit of creditors, giv-

ing a preference to these creditors over others, and that the Act of 1865, adopted by the bank and accepted by the preferred creditors, constituted an assignment by the bank ; that such preferences impair no contract, and being consummated before the passage of the Bankrupt Act by Congress, could not be affected thereby; and it claims that the President and Directors of the bank should be allowed to proceed with the execution of the statutory assignment thus adopted by them.

The answer further suggests that the State should be made a party through the Attorney General, and that the preferred creditors should likewise be brought in to defend their interests.

On the 3d day of February, 1868, C. M. Furman and Thomas R. Waring, by their solicitors, Hayne & Son, filed their respective answers, which deny any interest, except as President and Cashier of the bank, respectively, and adopt, as their own, the answer of the President and Directors of the bank.

On the 25th day of February, 1868, a petition was filed by Hayne & Son, solicitors in behalf of Baring Brothers & Co., of London, England, praying that they be admitted as parties defendant, and it was so ordered.

On the 3d day of March, 1868, at the February Term of the Court of Equity, certain decretal orders were adopted by consent of all the parties then before the Court, as well as by consent of the solicitors for the fire loan bondholders, the solicitors for the fire loan stockholders, and the Attorney General of the State. By these orders, the bill was amended, so as to make the Attorney General a party defendant for the purpose of sustaining the validity of the Act of 1865, and to make Baring Brothers & Company defendants in behalf of the fire loan sterling bondholders, and A. V. Dawson, and others, defendants, representing the six per cent. fire loan stock in America. It also required the Master of the Court of Equity to call in, by advertisement, all persons claiming to be creditors by reason of holding bills or notes of the bank, on or before the first day of June, 1868; also to notify all persons claiming to be creditors of the bank by reason of holding fire loan stock, to make proof of the same within the same period—that is, before the 1st of June, 1868. An injunction was granted by these orders restraining creditors of all classes from suing the corporation, except as parties to these proceedings, and restraining the bank, and its President and Cashier, from paying over assets to preferred creditors, without

prejudice however, to the right of the corporation to collect debts, and to change the form of the assets in possession.

On the 3d of April, 1868, the Attorney General filed his answer, which vindicated the Act of 1865, preferring certain creditors, and claimed that the Act of 1865 was confirmatory of the Act of 1838, known as the Fire Loan Act.

On the 15th of April, 1868, Maria Simons and another, in behalf of themselves and all others holding fire loan stock, and on the 20th of May, 1868, A. V. Dawson, filed their respective answers, both of which claimed under the Acts of 1838 and 1865.

On the 26th of May, 1868, the answer of Baring Brothers & Company was filed. From their answer, I copy the following statements, which seem to me necessary to a full understanding of the case. :

"In the month of April, of the year 1838, the larger part of the business portion of the city of Charleston was destroyed by fire. Trade was prostrate, and thousands of the inhabitants were without shelter. Such was the extent of the calamity that the General Assembly of South Carolina had been called together by the Governor, and had duly created and ratified, on the 1st day of June, 1838, an Act entitled 'An Act for rebuilding the city of Charleston.' This Act authorized the issue of the bonds referred to, for the sum of two millions of dollars, thereafter known as the 'fire loan bonds,' and hereinafter more particulary described. The funds thereby to be raised, were, by the scheme of the Act, to be placed in charge of 'the President and Directors of the Bank of the State of South Carolina,' to be used by them for the purpose of rebuilding the city of Charleston. The Act also provided for the appointment by the said 'the President and Directors of the Bank of the State of South Carolina,' of an agent to be 'commissioned by the Governor to proceed to Europe to negotiate said loan.' Under this provision, Mr. McDuffie, a distinguished and favorite citizen of the State, lately Governor, and for many years a leading representative of South Carolina in the American Congress, was appointed and accredited."

    *     *     *     *     *     *     *     *

"These bonds, known as 'fire loan bonds,' were of the form following, signed by the Governor of the State, to wit:

9

"'UNITED STATES OF AMERICA,
  "'STATE OF SOUTH CAROLINA.

" £1,000 ⎫  Loan under an Act for re-building  £1,000 ⎫
  " or    ⎬ Stg.    the City of Charleston,         or   ⎬ Stg.
" £500   ⎭  Five per cent. stock.  ·           £500 ⎭
    " No.

" By his Excellency, Pierce M. Butler, Governor of and Com-
mander-in-Chief in and over said State : Be it known that there is
due from the State of South Carolina to the President and Directors
of the Bank of the State of South Carolina, one thousand pounds
(or five hundred pounds) sterling, lawful money of Great Britain,
which sum of money the said State promises to pay the said Pres-
ident and Directors of the Bank of the State of South Carolina, or
their assigns in London, on the surrender of this certificate, on the
1st day of July, in the year of our Lord, one thousand eight hun-
dred and sixty-eight, (or one thousand eight hundred and fifty-
eight,) with interest thereon, at the rate of five per cent. per annum,
payable semi-annually from the date hereof, as it becomes due, on
presenting the several warrants herewith annexed, at the Banking
House of Baring Brothers & Company in London."
    (Signed)              "PIERCE M. BUTLER, *Governor.*
" Countersigned by
              " WM. EDW. HAYNE,
    " [SEAL.]                   *Comptroller General.*

" To the bonds were attached the following coupons, signed by
the Cashier of the bank, to wit :

              "'SOUTH CAROLINA STATE STOCK,
                "'Under an Act ratified 1st June, 1838.
"'BARING BROTHERS & Co., London :
    "'Pay to bearer, on 1st July, 1839, twenty-five pounds (or twelve
pounds ten shillings) sterling, being a half year's interest on bond
No.       for £1,000 (or £500) sterling.
              "'(Signed)              C. M. FURMAN,
"' £25 or ⎫              ·              Cashier of Bank of
"' £12.10 ⎭ Sterling.                  State of South Carolina.'
    " On the bonds was the following endorsement, signed by the
President of the bank, to wit :
    "' In pursuance of and by authority of an Act of the Legislature
of the State of South Carolina, ratified on the 1st day of June, one
thousand eight hundred and thirty-eight, the President and Direct-

ors of the Bank of the State of South Carolina, with a capital of three millions one hundred and fifty thousand dollars (including the present loan) for value received, assign and transfer the within bond to                      or bearer, and hereby guarantee the punctual payment of the principal and interest of the said bond as it becomes due at place specified within.

· (Signed)                                        " ' C. J. COLCOCK.
" ' Pres. of the Bank of the State of So. Ca.

" Mr. McDuffie exhibited in England double credentials; the first executed by the Governor of South Carolina, constituting him agent of the State, and the record by the President of the Bank, constituting him agent of the bank.    In Mr. McDuffie's address to the public, he makes the following statement:

" ' The Legislature, in order to make assurance doubly sure, has provided that in addition to the general pledge of the faith and resources of the State, particular funds shall be specially appropriated and solemnly pledged and set apart to secure the punctual payment of the interest and principal of this loan.   As this fund will partly consist of the profits which shall accrue from the two millions now to be borrowed, the mode in which it is to be used will be stated.   It is to be deposited in the Bank of the State of South Carolina, as so much capital to be employed by that bank, acting as the fiscal agent of that State, in accomplishing the object of the loan.' "

" In the same address, he publishes two Sections of the Act of 1838, which were as follows:

" ' SECTION XI. It shall be the duty of the President and Directors of the Bank of the State of South Carolina, to cause to be opened in the books of the said bank, an account, in which they shall debit themselves with the profits arising out of the additional capital created out of the two million loan, aforesaid, for the year ending on the first day of October, in the year of our Lord one thousand eight hundred and thirty-nine, and with all the future profits of the said loan, as the same shall be hereafter annually declared, which said fund, with all its accumulations, shall be considered solemnly pledged and set apart for the payment of the interest on the said loan, and the final redemption thereof, and it shall be the duty of the President and Directors of the said bank, annually to report to both branches of the Legislature the exact state of that fund.

" 'SECTION XII. When the profits of the said Bank of the State of South Carolina shall have paid the interest of certain stocks, for which they have heretofore been pledged and set apart, the said profits shall also be considered solemnly pledged and set apart, for the payment of the interest on the said loan and final redemption thereof.' "

"Upon the faith of these representations and assurances, the house of Baring Brothers & Company themselves became purchasers of these bonds to a large amount, and were active in inducing others to become purchasers. They believe that the bondholders became creditors of the bank (whose capital they furnished) as well as of the State. They relied on both. They relied on the honor and good faith of a State which had hitherto proved true to its engagements, but were all pleased that the bank, a moneyed institution, whose life was credit, and a corporation amenable to the laws of the country, was interposed between the State and trustee for the creditors."

As a part of the history of these proceedings, it is proper to notice the fact that the public advertisements, calling in billholders and fire loan stockholders in America, continued to be published from March 3, 1868, to May 20th, of the same year, in one or more of the leading newspapers in the cities of Charleston, Cincinnati, New Orleans, New York and Augusta, and that after May 20th, until July 1st, 1868, the following amended order was published in the same papers:

"OFFICE OF MASTER IN EQUITY,
"CHARLESTON, May 20th, 1868.

"I. All presenting claims in the above case, including holders of bills or bank notes, are required, in addition to the proof of the claims, to render into this, the Master's office, a statement, verified by affidavit, of the time when the same came into the possession of the holder, and the consideration paid therefor.

"II. *It is further ordered*, That all parties who have presented, or shall present their claims before Master Tupper, before the 1st day of June, shall be allowed until the 1st day of July next, within which to supply the statements as to the time the claims were required, and the consideration paid for them. But nothing in the order contained shall be construed as extending the period for presenting claims beyond the 1st day of June.

"III. *It is further ordered*, That neither the amended order nor

the orders hitherto made, are intended to conclude or to in any way prejudice the right or equities of the parties to this suit.

(Signed)            " JAMES TUPPER,

           " Master in Equity."

The exhibits filed with the report of the special referee, James W. Gray, Esq., show the extent to which proof has been made up to this time.

I may add that certain general creditors, such as persons claiming for work and labor, have, by consent of parties already in, been allowed at a late day to come in, representing themselves and others having like interests. These are entitled to an adjudication of their claims upon the assets in controversy, which have been a "fund in equity" since the decretal orders of March 2d, 1868. In April, 1869, the fund was transferred from the custody of the bank officers into the hands of a receiver, appointed by the Court, in whose hands they still remain, subject to the order of the Court.

The first inquiry presenting itself is directed to the equities of the complainants' bill. These seem all to be based on the effect of the original charter of the bank ; and it is assumed that the charter pledges to billholders through all time a lien on the bank, its capital and assets, in preference to all other creditors. I cannot perceive in the charter relied on, any provision which makes the bank, in this respect, differ from other banks. It is well settled that stockholders, or a sole stockholder, though that stockholder be a State, cannot withdraw from a bank its capital or assets to the injury of creditors—that the assets of a bank unable to pay " belong solely to the creditors." It has been decided that an Act of a State Legislature intended to effect such a result—that is, to withdraw the assets from the reach of creditors—is unconstitutional and void.

But these cases, although in some of them billholders were the creditors moving, make no distinction in favor of this class of claimants over others. It is simply as creditors that their rights are defined. Their rights are sustained as against stockholders setting up ownership, but the respective claims of creditors among themselves are not discussed. " A corporation," it is said, " unless restricted by its charter, or prevented by the operation of some bankrupt or insolvent law, may, by virtue of its general power to contract, make an assignment of its effects, entire or partial, with or without preferences, if made *bona fide* for the payment of its debts."—See Abbott's Digest, Law of Corporations, 44, and cases there cited. An ordinary charter, then, cannot be construed as pledging capital or assets so as

to constitute a lien. Otherwise, it would be too late to make preferences. Billholders, then, in my judgment, have not, as such, any priority by virtue of the charter of the bank over other creditors, and it is so adjudged.

The question that then presents itself is, whether the fire loan bondholders have any claim to preference, and, if so, to what extent? That they are creditors, I consider too plain for argument. In my judgment, Sections 11 and 12 give them, most clearly, a lien on the thing pledged: On this head, the authorities cited by counsel are to my mind conclusive. In the language of Judge Story, I consider it " a contract for an hypothecation " of future profits, and that when the profits once came into existence, " the right of the pledgee immediately attached."—Story on Bailments, 294 ; Coote on Mortgages, 233 ; 4 Kent, 138 ; 2 Spence's Equity, 777, and Kelly's Reports, 435. As to the extent of this lien, I am of the opinion that it covers everything which the bank now has in its possession, or rather the entire " fund in equity" in the hands of the receiver. Mr. Waring testifies that nothing contributed by the State as capital now remains in the form in which it was placed there. He says that it appears that the bank has accounted to the State for all. capital advanced from all sources, with interest in full thereon ; that, in fact, the State has withdrawn from the bank over and above the amount of capital advanced a large sum, and is now heavily indebted to the bank. He represents that the present assets of the bank have been considered as the result of past profits ; that the sinking fund made of profits was appropriated to the purchase of those assets. He states that since the year 1838, the profits of the bank have exceeded the value of the property and assets now held, and declares that, "if set apart and applied as directed by the Act of 1838, the fund accumulated would have greatly exceeded the present fire loan debt." All other debts for which profits were pledged, he says, have been paid. Mr. Furman entirely confirms this testimony.

It would appear, from this evidence, that as a matter of fact, the present property and assets of the bank are covered by a pledge of " profits." In the case of *Curran* vs. *The State of Arkansas*, 15 Howard, Judge Curtis expresses himself as follows : " Whatever losses a bank sustains are losses of the capital paid in by its stockholders. That is the only fund it has to lose. When it has become insolvent it has lost all that fund, and has nothing belonging to its stockholders. In some sense a bank may be said to owe its stock-

holders for the capital they have paid in. With the leave of the State they have a right to withdraw it, after all debts are paid; and if the State is itself the sole stockholder, it may withdraw its capital while any of it shall remain. But from the very nature of things, it cannot withdraw capital from an insolvent bank, because it has none of its capital remaining."

The Chief Justice of this State, in regard to this very bank and these assets, uses the following language:

" While it continued solvent, it was matter of little consequence to a creditor, how far, or to what extent the Legislature interfered by its control. When, however, the fact of its insolvency is apparent, whether the State is the sole stockholder or a co-stockholder with individuals, the fund which it supplied as capital no longer remains."—*The State ex rel. the Attorney General* vs. *The President and Directors of the Bank of the State.*

The counsel for defendants have, in further confirmation of this view, cited the case of *Garnet* vs. *Stewart*, 3 Sim., 308, in which Vice-Chancellor Shadwell decided that "a devise of rents and profits of the estate is the same as a devise of the estate itself." Again, they cite *Legard* vs. *Hodges*, 3 Brown Ch. Rep., 531. This case was twice argued, and on re-argument, Lord Loughborough confirmed the previous decision, that " to set apart and appropriate a third part of rents, etc., (to secure the payment of a debt,) was an equitable lien on the estate, the rents of which were so appropriated."

From the authorities above cited, it would seem that the pledge of the profits in the 12th Section of the Act of 1838 is equivalent to a pledge of the whole capital of the bank for the payment of the fire loan bonds, and the redemption of stocks provided for in that Section; and those stocks having long since been redeemed, the lien of that Section extends to all the present property and assets of the bank. According to the view I take of the 11th Section, it makes little difference whether the foregoing conclusions are or are not correct. It is provided in that Section that, " all the future profits of the said loan, as the same shall hereafter be annually declared, which *said fund*, with its annual accumulations, shall be considered solemnly pledged and set apart for the payment of the interest on the said loan, and the final redemption thereof." Here is a pledge of the two millions capital and its future profits. It is in proof that the State has long since withdrawn all the capital placed in the bank by it, except this fire loan, therefore the loan is

the only capital left in the bank, and this being solemnly pledged for the final redemption of the fire loan bonds, the present assets must be applied to their payment.

Having thus determined that the holders of the fire loan bonds are entitled, by virtue of the Act of 1838, to priority over the bill-holders in payment from the assets of the bank, the next question to be considered is as to the status of the holders of the fire loan stock. It is contended, on the part of both bond and billholders, that the fire loan stock is' not entitled to the lien created by the Act of 1838. Both bonds and stock are equally a part of the fire loan. The authority of the Act of 1838, was to procure the loan on the best terms, either in Europe or America, by the issue of bonds or other contracts. Whether the whole of the loan, or any part of it, was made in Europe or America, and whether the form of the loan thus effected should be by bonds or other contracts, as, for instance, stock, was entirely a matter of discretion. When thus created, in whatever form of contract, the loan, to the extent of two millions of dollars, was equally protected. It was for the whole loan thus created that the Bank of the State was to provide for the payment of the interest and principal, and to which the pledges of the Act of 1838 were to apply. The Act makes no distinction in reference to any portion of the loan. It places the whole upon the same footing.

It was urged, in argument, that the 1st Section of the Act of 1838 authorized and directed the Governor of the State to issue the bonds or other contracts, countersigned by the Comptroller General; whereas, the certificates of the fire loan stock exhibited in the case show that they are signed by the State Treasurer, and countersigned by the President of the bank, and because they are countersigned neither by the Governor nor the Comptroller General, the holders of the certificates cannot claim the benefits of the Act. It appears that in 1839, with the consent of the Governor, it was determined to issue, as a part of the loan, a six per cent. stock, of which three hundred thousand dollars was raised in that year. The Act of 1840 made further provisions in relation to the fire loan. In that Act it was declared that transfers of the stock issued by virtue of the Act of 1838, and the new certificates requisite upon such transfers, should be made by the same officers, and in the same manner as for other State stocks; and, as if to leave no doubt that the stock when thus issued was to be entitled to all the benefits of the Act of 1838, it added, " but the certificate shall upon its face exhibit that such stock has been issued under the provisions of the said Act."

It was further urged in argument that while the certificates of the fire loan stock are headed "Loan under an Act for rebuilding the City of Charleston," yet the stocks exhibited allege that they are created by virtue of Section 1 of an Act for rebuilding the City of Charleston, ratified 1st June, 1838, and therefore that the stock has reference simply to the 1st Section, and is not entitled to the guarantees of the other Sections.

In the view thus urged I cannot concur. It is the 1st Section only which creates the loan, whether in the shape of bonds or stocks. Without the 1st Section there would be no authority for the issue of the bonds, or of any contract for a loan. Both the bonds and stocks are created by the 1st Section. The other Sections provide the security for their redemption. It was upon the faith of the guarantees of the Act of 1838 that the bonds and stocks were taken, whether in Europe or America. Until the Act of 1865, the Legislature, by the reports of their investigating committees and their whole course of action, recognized that the pledges of the Act of 1838 applied without discrimination to the whole loan of two millions.

It is urged that by the 11th Section of the Act of December 21st, 1865, entitled "An Act to raise supplies for the year commencing in October, 1865," a statutory assignment of the assets of the bank was made; first, for the benefit of the bondholders; second, for the benefit of the stockholders; and, third, for the redemption of the outstanding bills issued by the bank. Conceding that the State had a right to assign assets belonging to it for the benefit of creditors, and that it had a right to make preferences, the proof in this showing, as we have seen, that it had already withdrawn more than it had put into the bank, I cannot conceive how the assignment of funds belonging to the creditors, and not to the State, could affect the rights of the parties. If I am right in my conclusions, the State had, long before the passage of the Act of 1865, solemnly pledged every dollar that remained in the bank in 1865 for the redemption of the fire loan bonds and stock, and therefore had no right to make any other or different disposition of that fund. In the one view, it was disposing of property that the State did not own; and in the other, it was a violation of solemn contract, upon the faith of which the loan was taken. But if I should be in error in this view, there is another, which, to my mind, is conclusive as to the invalidity of that Section of the Act of 1865. Section 22 of Article I of the Constitution of the State of South Carolina, adopted September 27,

1865, declares that "every Act or Resolution having the force of law shall relate to but one subject, and that shall be expressed in the title." On the 21st day of December, 1865, while that Constitution was in full force, the Legislature passed an Act entitled "An Act to raise supplies for the year commencing in October, 1865;" and the 11th Section of that Act directs how the assets and property of the bank shall be distributed. I am of the opinion that every provision of the Constitution of a State is mandatory, and the Legislature is bound thereby; hence I cannot resist the conviction that the 11th Section of the Act of 1865 is unconstitutional and void, because it is a subject entirely distinct from the subject of the Act, and is not expressed in the title.—*Baldwin* vs. *The Mayor of New York,* 42 Barbour, 549.

It is, therefore, *ordered and decreed,* That from the assets of the bank in the hands of the receiver, the fire loan bondholders and the fire loan stockholders be first paid, principal and interest, accrued and accruing, up to the date of their payment, upon the surrender by them of their bonds and certificates of stock respectively; but should the assets be insufficient to pay the whole amount due the bondholders and stockholders, then they shall be divided ratably between them.

But, if the assets should be more than sufficient to pay the fire loan bondholders, and the fire loan stockholders, it is further *ordered and decreed,* That the remaining assets in the hands of the receiver be applied *pro rata* to the payment of the holders of the bills issued by the bank, the depositors and other creditors of the bank, subject, however, to the modification hereinafter made.

The next question which presents itself for my consideration is as to the right of the holders of bills issued by the bank.

The State has become a party to these proceedings. It cannot be sued; but it may consent to be a party. No process of the Court, *proprio vigore,* can affect it. No order or decree can act upon it *in invitum.* When it does become a party, it is to the end that through its courts it may be advised of its rights or its obligations; and when these are ascertained, the highest sanction has been secured to enforce the one or discharge the other. In this case the State has, of its own will, submitted to its Courts the decision of the issues involved. At the hearing, it was so announced by the Attorney General then representing the State.

In considering the relation of the State to the holders of the bills of the bank, it is not necessary to give critical interpretation to so

much of the Act of 1812 as declares that "the faith of the State is pledged for the support of the bank, and to supply any deficiency in the funds specially pledged, and to make good all losses arising from such deficiency." When a State becomes a corporator, in that capacity, it retains no attribute of its sovereignty. It is regarded as an individual, so far as any exercise of control is concerned, in relation to the corporation. What an individual corporator may do, the State, as a corporator, may do, and no more. And where, as in some States, the Constitution provides that the State may be made a party to a suit, and, therefore, in such suit, a decree *in invitum* be made against it, there is no difference between the condition of a natural person and that of the State as a party to that suit. In this case, the assent of the State to become a party does not carry with it the assent that the order or decree should reach its property. The object, therefore, of the State connecting itself with this suit is that the nature and extent of its rights and obligations may be ascertained by the Court.

It has been shown, in this case, that the State contributed to the bank the whole of its capital. Its rights were those of a stockholder, and so were its obligations. The capital of the bank is pledged for the payment of its bills. It is held, or it is intended to be held, by the proper officers of the bank, as a trust fund, of which they are the trustees. The right of the stockholders to a return to them of what they contribute, can only arise when the debts of the bank have been paid. According to the testimony adduced, the State has drawn from the bank not only the whole amount arising from all sources which it ever contributed to its capital, with interest thereon, but it is largely indebted to the bank besides; and while this fact appears, the billholders, depositors, and other creditors are left unpaid.

If an individual held the relation to the bank which the State holds, he would be required to pay back to the bank at least as much as would satisfy its creditors. The right of the creditor against the State is as clear as it would be against the individual stockholder. The obligation of the stockholder is as clear in the one case as in the other. Nor is it lessened because in the case of the individual the order or decree could enforce his duty, while in the case of the State its Courts have no such process. But it cannot be supposed that a State will need any process, when it has the sense of duty in regard to its obligations announced in its own Courts. If the State had not withdrawn from the bank the whole

of its capital, the creditors of the bank would be paid. To those who would become creditors of the bank, the State had pledged that capital. At various times the Courts of the State have declared that the capital of the bank was pledged to its creditors. The pledge of the State, and the judicial declaration of it in the case of this bank, was that which had been everywhere declared to be the law governing such corporations. The principle that the capital belonged in the first place to the creditors of the corporation, and not until they were satisfied, to the stockholders, is settled beyond dispute. And equally well settled is it, that stockholders who have withdrawn capital before the claims of creditors are satisfied will be forced to bring it back.

The statement that the whole of the capital has been withdrawn by the State, has been made very positively by Mr. Furman and Mr. Waring, and no denial has been made of its correctness.

In giving force to the Act of 1838, and recognizing the prior equity of the creditors under that Act, I could not fail to observe the pledge of the faith of the State which it gave to those who, in that matter, became its creditors. Unquestionably the creditors of the bank have a right to ask of the State that its pledge, in relation to that bank, be redeemed. They only ask the State to give back to the bank that which belonged to it—which was its property, and which belonged to its creditors, and is their property.

In the discussion of the case something was said concerning the inhibition of the State to provide for the billholders, because of the amendment to the Constitution forbidding the payment by the seceding States of debts contracted in aid of the war. The point thus raised cannot be sustained. In the first place, the claims are against the bank, and the State is involved because it has taken the assets of the bank. The bank can have no more reason to question its liability in regard to its bills than would any other party to a contract who had entered into a lawful engagement during the war. But another reason is all-sufficient. It is proved that the bills now in question were not issued in aid of the war, but to relieve the necessities of the people, arising from the loan of bills of an older issue to the Confederate States. If any bills came within the terms of the amendment referred to, it is the bills which have been redeemed by the State by the issue of its bonds.

It was also said that the bills proved, in this case, had been purchased at a low rate, and that the claim for their face was unjust and extortionate. It would not be easy for one who had sold these

bills in open market, at less than their face, to a purchaser, *bona fide*, to come into Court and claim that he who had purchased should not receive from the bank more than he had paid for them; and it would be equally difficult to understand how the bank could claim that it was only liable for the amount paid by each purchaser for its bills. Within a comparatively recent period, the public securities of the State were sold at very reduced prices. If the objection now made as to these bills be well taken, it would seem to be equally applicable to all public securities. And yet few things would more affect the value of the public securities of the State than such an objection seriously pressed by those having control of its affairs.

But this objection, considered in connection with the bank, ceases to have any claim to consideration. When the bank issued its bill, it promised to pay the holder the amount specified on its face. That promise was made either to create a valid legal obligation, or to work a fraud. As it is not conceivable that it was made for the latter purpose, it must have been for the former. For every bill that it issued, the bank received consideration. For that it made the promise that is contained in the bill. And there is nothing afterwards and between other parties that can diminish its obligation to pay that bill, according to its face, to a *bona fide* holder.

In the case of *Furman Green & Co.* vs. *Michel, Collector of Taxes*, recently heard and decided in the Supreme Court of the United States, the question was considered how far the guarantee of the State of Tennessee extended. In the judgment of the Court this language is used:

"An attempt is made to restrict the operation of the guarantee to the person who, in the course of dealing with the bank, receives the notes, and not to extend further. * * * The guarantee is, in no sense, a personal one. It attaches to the note; is part of it; as much so as if written on the back of it; goes with the note everywhere, and invites every one who has taxes to pay to take it."

It would seem, from the last mentioned authority, that the State of South Carolina was bound to redeem these bills to the extent of the original pledge made in the Act of incorporation, and that, certainly, was to the amount of the capital stock furnished by the State. But I prefer to rest my judgment of the liability of the State, in this case, upon what I regard as the true and unquestionable grounds. The bank is insolvent. The State is its debtor. It owes, first, the amount of capital stock furnished by the State; and

it owes, second, large amounts borrowed by the State in addition thereto. The creditors of the bank, therefore, have the right to payment of the amount of the indebtedness of the State into the bank for the purpose of being applied to their debts respectively. So far as the bills are concerned, this claim should be for the full amount of the face of said bills, while such bills were issued upon a specie basis, and until they were practically Confederate transactions, from which time, taking the date of the bill as the data, they should be scaled like other transactions made with reference to Confederate money.

What I have said in reference to the bills of the bank applies, in my judgment, with equal force to the depositors and other creditors of the bank whose claims are unsecured under the Act of 1838 ; it is therefore

*Ordered,* That this case be referred to the Hon. B. F. Dunkin, as special referee, and that he call in the two classes of depositors represented in this case by those who deposited before the war, and those who deposited during the war, by advertisement, published in the Charleston Courier, Charleston News, and Columbia Phœnix, for six weeks, on or before the 15th day of August, 1870, to prove their claims ; and if such claims are not so proved, they will be barred from all participation in the assets of said bank, or claims upon the State ; and it is further

*Ordered,* That the said special referee take proof as to the character of the indebtedness to said two classes of depositors, as to whether the transactions were with reference to lawful money of the United States or Confederate currency ; and as to such of them as he finds to have been in Confederate currency, he will ascertain the value of each claim in the lawful currency of the United States ; and it is further

*Ordered,* That the said special referee also ascertain what portion of the bills already proved were issued with reference to Confederate currency ; and as to such bills, he will ascertain their value in lawful money of the United States. And he will also ascertain what portion of the other debts already proved were contracted in Confederate currency ; and, as to such debts, he will ascertain their value in lawful money of the United States at the date of the contract ; it is further

*Ordered,* That the said special referee ascertain the amount of the indebtedness of the bank upon the principles of this decree, giving to the State credit for the amount of stocks and other securities

left with the bank as collaterals, and giving to the State also credit for the amount of the bills redeemed by the issue of bonds; and it is further

*Ordered*, That the said special referee tax the costs of this suit, and report to this Court on the first day of its next November Term.

The holders of the bills of the bank appealed, on the following grounds:

1. Because, by the charter of the bank, in 1812, and the several renewals of that charter, and the rule of law applicable in such cases, the assets of the bank must be applied to the payment of the creditors of the bank; and among such creditors are the holders of the bills of the bank.

2. That over so much of the assets of the bank as are or may be necessary for the payment of the billholders and creditors of the bank, the State as sole stockholder has no lawful right or power to make any appropriation or disposition of them by which the creditors of the bank would be delayed or defeated in the recovery of their claims.

3. That the pledge of the profits of the bank, as it appears in the Act of 1838, is only the pledge of what the State, being entitled to take after the debts of the bank were paid, had a right to pledge. That profits are only ascertained after debts are paid; and no profit exists when the assets are not sufficient to pay the debts.

4. That the Act of 1838 was not a modification of the charter of the bank; it was not so intended, and cannot be so construed. That when the Act of 1838 was passed, the charter of the bank, by the Act of 1812, was of full force, and so continued in all respects and without modification, so far as creditors of the bank are concerned, in its renewal by the Act of 1833, and subsequently by the Act of 1852.

5. That the lawful issue of the bills of the bank, of whatsoever dates of issue they may be, unless otherwise plainly designated, are of the like and equal legal obligation. That the obligation they impose arises from the charter, and the liability they create is referred to the charter.

6. That the proposition that the Act of 1838 was a notification to the holders of bills of the bank, subsequently issued, of a modification of the charter of the bank, or that their rights as creditors of the bank under its charter, were intended to be, or were, in fact,

modified or impaired by the Act of 1838, is not the true interpreta-
tion of the Act of 1838, and is inconsistent with the terms of the
Act of 1812, and the subsequent Acts renewing the said charter;
and with the purposes of those Acts in the establishment of a bank,
and the pledge of the State, as it is made in the Act of 1812, and
in the other Acts of 1833 and 1852.

7. That whatever may have been the claims of the holders of the
fire loan bonds, if the addition to the capital of the bank arising
from those bonds had been left with the bank when the State with-
drew from the bank the whole amount that had been so deposited
with the bank, as between the State and the bank, the primary
liability for these bonds was with the State, and should have been
so decreed.

8. That with such primary liability on the State, the State could
not have any right to appropriate or apply the assets of the bank
to the payment of these bonds, and leave the proper creditors of
the bank unpaid.

9. That, where the holders of the fire loan bonds had an admitted
liability of the State for their claims, and the creditors of the bank
had no other admitted claim than against the assets of the bank,
the holders of the fire loan bonds should be confined to their remedy
against the State.

10. That the holders of the fire loan stock are not creditors of
the bank.   The stock they have is a part of the public debt of the
State, so recognized by the State, and the holders thereof have no
more right to claim the assets of the bank, to the exclusion of the
proper creditors of the bank, than have the holders of any portion
of the public debt of the State.

11. That the holders of fire loan bonds and stocks, who advanced
moneys to the State under the Act of 1838, with notice under that
Act, that such moneys were to become a part of the capital of a
bank, have no equity against creditors of the bank who deal with
the bank on the faith of its capital being liable to its creditors.

12. That no part of the stocks and securities set forth and con-
sidered as belonging to the sinking fund, was proved to belong to
that fund.   The Act of 1852 expressly provided the manner in
which the profits of the bank should be disposed of, and the man-
ner in which securities belong to the sinking fund should be desig-
nated.   None of the stocks and securities were so designated.   They
could not be identified by Mr. Waring, the Cashier, as belonging to
that fund; no account was kept of investment for that fund; and

the decree in this case establishes, as a fact, which no witness undertook to prove.

13. That in relation to the choses in action left in the hands of lawyers for collection—the real estate of the bank—the State bonds lodged with the bank by the State as collateral security for the repayment of moneys advanced for the New State House; and the shares of the Charlotte and South Carolina Railroad lodged also as security for the advances made by the bank to pay the subscription of the State to that railroad; these nowhere appear as the property of the bank, otherwise than as collaterals to secure the repayment of loans made by the bank in the course of business; are not regarded by the bank as profits; constitute no part of what is regarded as the sinking fund; and do, in fact, represent so much of the capital of the bank, as not withdrawn, still remained in its possession, and is now in the hands of the Receiver.

The President and Directors of the bank and the State of South Carolina, appealed also from so much of the decree as is embraced by the following words, to wit:

" But if the assets should be more than sufficient to pay the fire loan bondholders and the fire loan stockholders, it is further-ordered and decreed that the remaining assets in the hands of the Receiver be applied *pro rata* to the payment of the holders of the bills issued by the bank, the depositors and other creditors of the bank, subject, however, to the modifications hereinafter named."

The solicitors for Baring Brothers & Co., also appealed, on the grounds:

1. The decree errs in deciding that the Act of 1838, for rebuilding the city of Charleston, created a lien on the assets of the bank in favor of the fire loan stockholders, equal in all respects with the lien given by that Act to the fire loan bondholders.

2. It is submitted that if any lien was given by said Act securing that portion of the debt incurred by the State in issuing State stock, the lien was intended for the protection of the State, and not for the holders of the stock. Neither the circumstances of the issue, nor the language of the scrip, imply any direct contract with the holders of the stock; and it was competent for the State, at any time before condition broken, to waive or postpone the lien intended for its own protection. According to the testimony there has been no failure to pay the holders of this stock up to this day. The princi-

pal is not due, and the interest has been paid, latterly, in gold. The stockholder cannot therefore claim by subrogation, there being no condition broken. The bonds are past due, and no interest has been paid since January, 1868.

3. The decree errs in setting aside the 11th Section of the Act of 1865, entitled "An Act to raise supplies." This Section, it is submitted, is germane to the subject-matter of the Act expressed in the title, as it was in effect a provision to raise supplies for meeting a debt. And if not germane it is not on that account void.

4. Defendants, representing fire loan bondholders, submit, further, that the 11th Section of the Act of 1865 does not contravene the Act of 1838. On the contrary, in apportioning the assets, first, to payment of the fire loan bondholders, it confirms the contract made with them in pursuance of said Act; and in postponing fire loan stockholders, the State simply waived its own security and violated no contract.

5. The Act of 1865 was the action of the sole stockholder, and being ratified and acted upon by the President and Directors of the bank and accepted by the preferred creditors, it became an assignment by the corporation.

6. If this assignment, made before the passage of the Bankrupt Act, violated no previous contract, it is a valid assignment, and gives priority to fire loan bondholders.

7. If the Circuit decree should be so modified as to place bill-holders upon the same footing with fire loan bondholders and stockholders, then defendants submit that the holders of such bills who came into possession of the same after the insolvency of the corporation, cannot claim to share the fund in equity as creditors according to the face value of such bills, but they must share said fund, if insufficient to pay debts in full, according to the price paid for said bills.

8. Should the Circuit decree be so modified as to place *all creditors* of the corporation upon the same footing, defendants submit that persons who deposited Confederate money in said Bank have no claim upon the fund in equity.

Dec. 2, 1871.　The opinion of the Court was delivered by

MOSES, C. J. The decree of the Circuit Judge presents the issues on which his judgment was rendered, and the notices furnish the grounds of appeal on which its reversal or modification is asked. The question submitted for our consideration involves the mode in

which the assets held by the Receiver appointed by the Court, for and on account of the corporation lately existing as the Bank of the State of South Carolina, admitted to be insolvent, are to be distributed among its creditors, and these may be divided into four classes:

First, the holders of the bonds issued under the Act of June 5th, 1838, for rebuilding the City of Charleston; second, the holders of the 6 per cent. stock, claiming by virtue of the same Act; third, the billholders of the said corporation; and, fourth, the depositors and general creditors.

The case has been ably and elaborately argued, and has received all the consideration which was demanded, more from a deference to the zeal with which the various claims have been pressed, than from any serious difficulty on the part of the Court in arriving at what it regards a just conclusion. It will be necessary, before proceeding further, to refer to so much of the history of the institution as relates to its establishment, and to the character of the claims which are before us for adjudication.

By the Act of 1812, 8 Stat., 24, a bank was established "on behalf of and for the benefit of the State." All the stocks then owned by the State, of any description whatsoever, and enumerated in the Act, the unexpended money in the Treasury, and all the taxes to be thereafter collected on account of the State—the last subject to the drafts on the part of the State, authorized by legal appropriation—were to constitute and form its capital, and was vested in the President and Directors to be elected by joint ballot of the Legislature. It was made a corporation and body politic, "and the faith of the State was pledged for the support of the said bank, and to supply any deficiency in the funds specifically pledged, and to make good all losses arising from such deficiency." The corporation had the right to hold property, and the same to convey at pleasure; to sue and be sued. All the powers usually enjoyed by banking corporations were vested in the President and Directors. The whole capital having been contributed by the State, it was the sole owner and stockholder. By the charter, the income of the bank was to be a part of the revenue of the State, and the bills or notes of the corporation originally made payable, or which shall have become payable on demand in gold or silver coin, were to be receivable at the Treasury, either at Charleston or Columbia, and by all the tax collectors and public officers, in all payments for taxes or other moneys due. It is not necessary for the solution of the several questions

before us, to refer to the subsequent Acts of the Legislature, which, from time to time, increased the capital of the bank, by requiring all public officers to deposit their receipts therein, or created loans upon which the corporation was to bank, except the Act of June, 1838, 7 Stat., 156, on which the fire loan bond and stockholders found their claim to a specific lien on the assets of the bank, which now alone consist of real estate, bonds, stocks and outstanding personal debts.    The charter was to continue until May 1st, 1835.    In December, 1833, 8 Stat., 67, it was extended to May 1, 1856, and in December, 1852, again extended to January 1, 1871, 12 Stat., 151.

By the Act of June, 1838, (7 Stat., 156,) entitled "An Act for rebuilding the City of Charleston," the Governor was directed, "in the name of the State, to issue bonds or other contracts, to be countersigned by the Comptroller General, not to exceed two millions of dollars—one million to be payable at the expiration of twenty years, and the other million at the expiration of thirty years—at a rate of interest not exceeding six per cent., for the purpose of procuring a loan, on the credit of the State, to re-build that portion of the city of Charleston then lying in ruins," and it was enacted by the first Section thereof, "that the faith and funds of the State of South Carolina be, and the same are hereby, pledged to secure the punctual payment of the said bonds or contracts, with the interest thereon."

By the second Section, the Governor was authorized and directed to commission such agent or agents as the President and Directors of the Bank of South Carolina should appoint, which agent or agents were empowered to receive the said bonds and contracts, and to make all such arrangements as in his or their judgment may be deemed expedient for procuring the said money, and placing it to the credit of the State, subject to the draft or order of the President of the bank.

By the third Section, it was enacted that "the money, when realized in Charleston, shall be deposited in the Bank of the State of South Carolina, and shall become a part of the capital thereof."

The tenth, eleventh and twelfth Sections are quoted in full, as the Fire Loan bond and stockholders rely on them as creating a trust on their behalf, attaching on the assets now held for appropriation and distribution.

"SEC. X. It shall be the duty of the President and Directors of the Bank of the State of South Carolina to make proper provisions or the punctual payment of the interest of such loan as may be

effected upon the credit of the State under the provisions of this Act, and also for the ultimate payment of the principal thereof.

"SEC. XI. It shall be the duty of the President and Directors of the Bank of the State of South Carolina to cause to be opened on the books of the said bank an account in which they shall debit themselves with the profits arising out of the additional capital created out of the two millions loan aforesaid, for the year ending on the first day of October, in the year of our Lord one thousand eight hundred and thirty-nine, and with all the future profits of the said loan, as the same shall hereafter be annually declared, which said fund, with its annual accumulation, shall be considered solemnly pledged and set apart for the payment of the interest on the said loan, and the final redemption thereof; and it shall be the duty of the President and Directors of the said bank annually to report to both branches of the Legislature the exact state of that fund.

"SEC. XII. When the profits of the said Bank of the State of South Carolina shall have paid the interest of certain stocks for which they have heretofore been pledged and set apart, the said profits shall also be considered solemnly pledged and set apart for the payment of the interest on the said loan, and the final redemption thereof."

Though the bank was established "on behalf of and for the benefit of the State," which held the relation to it as a sole stockholder, its obligations and responsibilities to its creditors are to be measured by the same standard which would be applied if it constituted a company representing the interests of individual stockholders. It can demand no privilege, immunity, or exemption by reason of its connection with the State, nor is it subject to a higher responsibility because it represents a State as its only stockholder. In regard to its creditors, it can occupy no other position than a corporation composed of private citizens.

It is claimed for the Fire Loan bond and stockholders that the 11th and 12th Sections of the Act of 1838, create a prospective lien upon the "fund" pledged in Section 11, and upon the profits in Section 12, to wit: the profits arising from the original capital of the bank after payment of certain debts for which said profits had been previously pledged, and which have been fully satisfied. It is not to be denied that a pledge may be created by written directions to hold property to meet a specified demand, or to devote to a special and stated purpose the rents and issues of a particular estate. In fact, any contract, in writing, by which one engages, for a con-

sideration, that another may have the income or yield of either real or personal property, (in proper form to affect such property) or the profits of his stock, or other moneyed investment, will amount to such a devotion of that so set apart as the principal from which the rents, income, or profits were to accrue, as in equity will constitute a charge upon it. The principle, as in the case of a technical pledge, is not restricted to such property as may be in existence, but will extend to future earnings and income. The authorities referred to in the argument, leave no doubt of the position. It is necessary, therefore, to inquire, assuming that some pledge was thus made by the said Act, what was its character and extent? The word "fund" is used only in the 11th Section. The bank was required to debit itself with the profits arising out of the additional capital of the said two millions loan for the year ending on the first of October, 1839, and with all the future profits of the said loan, as the same should thereafter be annually declared, which said fund and its accumulations were solemnly set apart for the payment of the interest on the said loan, and the final redemption thereof.

The additional capital was not to remain in the bank, but was to be engaged in its usual business, the bank, however, being required to loan the applicants, for the purpose of rebuilding in the city of Charleston, the same amount of money, if so much was required. It was the profits arising out of the additional capital for the year ending October 1st, 1839, with all the future profits of the said loan, as the same shall be annually declared, which were to constitute the "fund." These were not known, and could not be anticipated, and the bank was, therefore, properly directed to keep them in a distinct form, that their amount might at once be capable of ascertainment. The 12th Section gives the same direction as to the general profits of the bank, after the redemption of certain stocks for the payment of which they had been previously set apart. The fire loan bond and stockholders, however, contend, that even if the two million additional capital, under the construction to be given by the Court to the said Sections, cannot be included in the fund pledged for their debts, then, that the remaining assets of the bank represent its profits during its existence, and are covered by the lien of the fire loan debt, which must be wholly satisfied before any other creditor can have any share of them. The argument proceeds upon the ground that a pledge of the profits is a pledge of that out of which the profits are to arise: authorities are referred to for the purpose of showing that a devise of rents and profits is

a devise of the land itself, and will carry the legal as well as the beneficial interest therein.

The application of the principle to devises, proceeded from the disposition of the Courts not only to effect, if possible, the purpose of the testator, but to give the devisee the bounty intended for him in a shape in which he could enjoy it, and to place at his command the direction and control of the very fund to the profits of which he was entitled. When the rents and issues are only given for a limited time, the rule does not seem to apply, for the reason of it ceases.—*Earl* vs. *Grim*, 1 John. Ch., 499. The doctrine has been extended to legacies and dividends, and interests in stock and funds. It was held in *Philips* vs. *Chamberlain*, 4 Ves., 51, that where trustees were directed by a will, to pay the *dividends and interests* of certain stock and funds to the legatees, share and share alike, and the survivors of them, as they attained the age of twenty-one, &c., the whole interest passed to them. The rule has also been applied to deeds, as in *Legrand* vs. *Hodges*, 3 Brown C. R., 531, where it was held that "a covenant to appropriate one-third of the produce of a real estate to raise a sum of money, is not a mere personal covenant, suable at law, but creates a lien upon the land, and the covenantees are entitled to have it specifically performed." In all the cases where the principle is enforced, it is with the view of giving effect to the intention of the instrument, by requiring that the right and use under it may be co-extensive with the design implied from its terms. It would, however, be difficult here to infer, that in an Act when the Legislature employed both the words "capital" and "profits," apparently having in mind the well-established difference in their import, the use of the latter word in the said Sections was intended to convey, by way of pledge, not only the profits, but the capital itself. The rule is never so enlarged as to include that which is not covered by the immediate grant. If "an agreement, as to the produce of land, affects the land itself," can it be so amplified as to include land of which the produce is not conveyed or pledged? So if the pledge insisted on under the Act of 1838, of the two million capital, or the profits which it has yielded, cannot be redeemed for want of a fund which can properly represent either, can the holders of the fire loan bonds and stock claim, by virtue of their lien, the assets now held for the bank, unless it can be shown that they are of the profits so pledged to them?

By the 11th Section of the Act a distinct account of the profits of the additional capital was directed to be kept, which said fund, and

its annual accumulations, were to be considered solemnly pledged and set apart for the payment of the interest on the said loan, and the final redemption thereof. So far from this having been done, according to the testimony of Mr. Waring, the Cashier, although the requirement was brought to the notice of the President, it was purposely avoided. Though the net profits of the bank were annually ascertained, the practical sources from which they arose could not be distinguished. Before, therefore, these holders of bonds and stock under the fire loan could enforce their claim against the existing assets, it would be incumbent on them to shew, that they in some way represent the profits pledged to them by the said 11th Section. If they cannot be distinguished, it is beyond their ability to do so. What practical advantage can they derive from the 12th Section, which they aver gives them a lien on all the profits of the bank, "when they shall have paid the interest of certain stocks and redeemed the stocks for which they have heretofore been pledged and set apart," admitting that such payment had been made.

The bank is insolvent. Its capital is gone, and all that the corporation holds are the assets already referred to. In what view can they be considered as the representative of profits? Were they so regarded by the bank? In 1821, Stat. 6, 665, the Legislature provided "a sinking fund for the redemption of the 6 per cent. stock of the State," and the bank was required to open an account in which it should debit itself annually with the profits, and the fund and its accumulations were set apart for its redemption. In 1852, 12 Stat., 150, the profits of the bank were directed "to be carried to the credit of the sinking fund," and the account of the fund was to "be kept in such a manner as to shew, at all times, what particular bonds, notes, stocks and other securities, belong to the said fund." Not only did the bank fail to keep such an account, but the sinking fund has never been distinguished from the capital, and was banked on in common with it.—Report of Comp. Gen. Harrison, Bk. Comp., 692; Report of President Elmore, Ib., 533; Report of Invest. Com. of Legislature, 1841, Ib., 225; Report of President Furman, Reports and Resolutions of Session of 1863, 72, 73.

Notwithstanding the insolvency of the bank, it is yet claimed that all which remains in the shape of property to this once great moneyed institution, whose capital is not only gone, but whose assets are inconsiderable, when compared with the extent of its indebtedness, represent its profits.

There would, as it appears to us, be something anomalous, if not

contradictory, in holding what may be left of value to an insolvent corporation as the representative of profits. If there were profits, no matter how small, how could there be insolvency?

"The word insolvent, unless controlled by the context, means unable to pay debts, in the ordinary acceptation of the phrase." 2 Lindley on Partnership, 695. Le Blanc, J., in *Bayley* vs. *Schofield*, 1 M. & S., 353, says: "I take it, insolvency, as it respects a trader, to mean that he is not in a situation to make his payments as usual, and that it does not follow that he is not insolvent because he may ultimately have a surplus upon the winding up of his affairs." Here, unfortunately, this long continued litigation in regard to all that is left of this corporation, plainly concedes the sense in which the term is to be applied. Its liabilities are largely in excess of its means to meet them.

The word profit presupposes an excess of the value of returns over the value of advances.—1 Lindl., 11. If the amount of the capital invested in a particular business is returned to its owners, while there is no gain, there is no loss. If it is returned increased, there is profit; but if it is swallowed up in the speculation in which it has been employed, though there may be assets left which were held while the capital was in active employment, still, if they are not sufficient to meet the engagements contracted in the enterprise to which the capital was employed, they can, in no sense, be taken as standing in the place of profits, which could never result from a profitless employment.

"In ascertaining the profits of a business, the value of the partnership property is to be found, and the original capital, with interest, (if necessary,) is to be deducted: the residue will represent the profits."—*Dunham* vs. *Bradford*, 5 L. R. Ch. Appl. Cases, 519.

What are the remaining assets of the bank to be considered? When a corporation is insolvent, as we have said in the *State* vs. *Bank of the State of South Carolina*, 1 S. C., 76, the fund supplied as capital no longer remains, that is to say, the amount which the stockholders advanced as capital is not in a shape or form to which the term, in its proper significance, can apply.

If A invests his whole estate of $10,000 in trade, and on winding up his affairs, finds that he owes $15,000, and has assets in value equal only to $5,000, the fund which constituted the capital of the business is exhausted, although the assets on hand were derived from the operations in which it was employed. We should, however, be rather inclined to the conclusion, that they represented the

money of his creditors which had been used for their acquisition. If it is asked, how can this apply to the State bonds lodged with the bank, as collateral security for the repayment of money advanced by the bank for the new State House, and the shares of the Charlotte & South Carolina Railroad, lodged also as security for advances made by the bank to pay the subscription of the State to that Railroad, the answer is, that the money used by the bank for such advances was of the funds for which it now stands liable to its creditors. In no case can they be considered the profits of the bank.

If a pledge was given by the Act of 1838, amounting to a specific lien, the subsequent legislation of the State, in 1839 and 1852, by appropriating the subject-matter already pledged to the fire loan, could not affect its validity. If the pledge amounted to a contract, it would be no sufficient answer, when its bond or stockholders sought to enforce it, that the debtor had pledged the same security to another creditor. Nor can the failure of the holders to take action be construed as an acquiesence on their part with the new direction of the fund already pledged to them.

The conceded solvency of the bank, with its prospect of so continuing, made it an object of little moment to the creditor how the Legislature interfered in the disposition of its funds, and no want of good faith can be attributed to the State, in attempting to divest securities already appropriated, for, by the charter, " the faith of the State was pledged to the support of the bank, and to supply any deficiency in the funds specifically pledged, and to make good all losses arising from such deficiency."

It is intimated, however, that the bondholders, under the fire loan, are not creditors of the bank. That its guaranty of the bonds, by the statement which appears upon 'them, must be referred to the power conferred on the bank by the Act, and whoever accepted them, did so with the limitation imposed on the extent to which the bank could guarantee them. We say intimated, because the objection was not pressed with an apparent confidence in its soundness.

It was competent for the bank to incur an obligation in the legitimate course of its business. It was incident to its powers, as a body politic, to enter into contracts not inconsistent with the purposes for which it was organized, unless forbidden by the charter. To say that it was restricted to those created by the issue of notes, would have so cramped and encumbered its administration that the

end for which such corporations are generally organized, would, to a large extent, have been defeated. No one would doubt the right of the bank to transfer a note made payable to its order, and yet such an act would create a liability on its part. Here the loan to be raised was to be added to its capital, and it was to its interest to lend its name, as a guarantor, to effect a purpose which promised profits in its employment. But even if the guaranty was originally without authority, its recognition by the State, at various times, and on various occasions, has placed its validity beyond dispute.

Before we consider the effect of the Act of 1865, on the claims of the several classes of the creditors of the bank to the assets now held on its account, it is proper that we dispose of so much of the appeal on the part of the fire loan bondholders as submits error in the decree, in deciding " that the Act of 1838 created a lien on the assets of the bank in favor of the fire loan stockholders, equal in all respects with the lien given by the Act to them." While we hold that by the terms of that Act neither the said bond or stock-holders are entitled to the said assets under any appropriation or contract which confers a lien, we can distinguish no difference in their rights growing directly out of the Act itself.

The character of the fire loan stock is not to be determined by the fact that the money raised through it was never appropriated to the purpose which the Legislature contemplated. It constituted a part of the two millions directed to be borrowed, and if there were any assets which could be held subject to a lien, by the force of the Act, in favor of the bondholders, we do not see how the holders of the stock could be placed on any different footing in regard to them. The difficulty with those who hold that portion of the loan, which was issued in the form of stock, is, that they have no contract with the bank. It never guaranteed the payment of the stock, which, though "a contract" under the Act, entered into by the Governor on behalf of the State, imposed no liability on the bank. In all the legislation of the State, in the reports of the President and Directors and of the investigating committee appointed by the General Assembly, it has been recognized as issued under the fire loan Act, and therefore protected by its provisions. The Act of 1840, 11 Stat., 130, refers to the stock "as issued in virtue of the said Act of 1838," and the certificate of it is required, upon its face, to exhibit that such stock has been issued under the provisions of said Act. Although not a debt against the bank, it would have been entitled equally with the bondholders to the benefit

of any assets which could be referred to the pledge under which both classes now prefer a claim.

If the Act of 1838 can not be held to establish a lien on the assets in the hands of the Court for distribution, then the bond-holders claim that the 11th Section of the Act of 1865, 13 Stat., 267, is in itself a valid assignment of the effects of an insolvent debtor, and that by its terms they have a preference to the said assets.   This is resisted by the fire loan stockholders, the bill owners and depositors.   The said Section, after directing that the branches and agencies shall be closed, and that the principal bank at Charleston shall cease to be a bank of issue, authorizes and requires the President and Directors " to collect the assets and property of the bank, and hold the same specially appropriated : *first,* to the payment of the principal and interest of the bonds, known as the fire loan, payable in Europe ; *second,* to the payment of the principal and interest of the fire loan bonds, payable in the United States ; and, *third,* to the redemption of outstanding notes hitherto issued by said bank."

The legal title to the property of the bank was in the corporate body, the President and Directors.   The sole stockholder is the State itself.   The property, if not bound by a valid lien, may be disposed of by the bank in its corporate capacity.   It is, however, but the agent of the stockholder, bound to execute his directions in the disposition of the fund which it holds, by and under his appointment.

A corporation has the same right to deal with its property through a conveyance, whether by actual sale or assignment for the benefit of the creditors, as an individual has.   It is a right incident to ownership, and its exercise is not trammelled with any other conditions or restrictions than those which the law imposes.   A preference, if fair and honest, may be given by an insolvent person to one creditor, to the exclusion of all others, and this right is not denied to a corporation, though without means to meet all its liabilities. " A corporation, unless restricted by its charter, or prevented by the operation of some bankrupt or insolvent law, may, by virtue of its general power to contract, make an assignment of its effects, entire or partial, with or without preferences, if made *bona fide* for the payment of its debts."—Abbot's Digest Law of Corp., cases there cited ; Angell and Ames on Corporations, 155 and 156.

Is the Act of 1865 such an assignment as conferred a vested right on the creditors which it proposed to prefer, and, therefore, irrevocable on the part of the State, the sole stockholder of the corpora-

tion? If it amounts, as is contended, to a statutory assignment which transferred the assets from the State to the creditors in the order prescribed, then the creditors took a vested interest beyond the power of a subsequent Legislature, either as to repeal or modification. If the fund has been transferred by the agent to the hands or dominion of the creditor, such transfer would have operated to change the ownership, and the power over it would have passed from the principal. Before, however, any express act of transfer or change of control, the mere expression of willingness, on the part of the creditor, to accept the disposition intended by the principal, would not so affect the relation of the principal to the fund as to deprive him of all power over it. While in the hands of the agent, unless affected by words sufficient to create a vested right, it is within the discretion of the principal to revoke the order for its disposition, or entirely to recall it. In Story on Agency, Section 465, where the author treats of the revocation of authority to an agent, it is said: " So if it has been in part put in the course of execution, but not to such an extent as to become obligatory between the parties, as if preliminary proceedings only have been instituted." From the passage of the Act to March 3d, 1868, the date of the injunction granted in this case, no action was taken by the President and Directors which changed the legal or beneficial interest in the fund, nor, up to that time, was there such an acceptance of its provisions on the part of the creditors proposed to be preferred by it which amounted to a contract that would preclude the State from further intervention between them and the bank in the administration of the said assets. The Act of September, 1868, 14 Stat., 22, by its 11th Section, in express terms, repealed the said Section of the Act of 1865, and unless it can be held to have vested a right, or constituted a contract, on the part of the State, with the creditors named in it, it was within the power of the Legislature not representing the sovereignty of the State, but in its capacity as sole stockholder, to revoke the authority to its agent to perform an act, which, while it remained unexecuted, did not change its control over the property to which it referred.

The statute cannot have the force and effect which is claimed for it as an assignment. The title to the assets was not in the State but in the bank. The direction was not to the President and Directors to execute an assignment by which the legal title was to be transferred, but was "to hold the assets especially appropriated to the payment of" certain classes of the creditors in a named order. The

State may, by Act of the Legislature, divest itself of property and vest it in another. There are here, however, no words which shew an intent to deprive itself of all control of the fund. Mr. Justice Story, in *Furman et al.* vs. *Jackson,* 5 Peters, 594, says: "Whatever may be the inaccuracy of expression, or the inaptness of the words used, in a legal view, if the intention to pass the legal title can be clearly discerned, the Court will give effect to it, and construe the words accordingly." Is there anything in the language employed in the statute which denotes an intention to change the legal ownership, and if this is not accomplished by the terms of it, how can it be said to amount to an assignment? The Act of 1865, until executed, was but the assertion by the State "of its proprietory rights over the assets," but was neither in design or effect a contract with the fire loan bond or stockholders.

Even if the preference sought to be derived from the Act could be ascertained as applying to the classes of claimants who are in fact creditors of the bank, what can be said of so much of it as undertakes to "appropriate" the property of the bank to persons who do not stand in the attitude of creditors to it?

We have already said that, in our judgment, the holders of the fire loan stock were in no way creditors of the bank while they are creditors of the State. The assets of the corporation must be held, first, applicable to the payment of its own creditors. When, therefore, the State undertook to appropriate the property of the bank to the payment of debts for which the bank was not liable, but which the State contracted, and in which it alone was the debtor, it brought itself within the principle announced in *Curran's* case, 15 How., 304, and which was adopted by this Court in the *State* vs. *The Bank of the State of South Carolina,* before referred to. It was an attempt to divest the property of the bank from the reach of its creditors, and to devote it to the payment of a debt contracted alone on the faith and credit of the State—to abstract it from the debts of the bank, and dedicate it to a debt of the stockholder for which the bank was not bound. It is not of consequence to consider how far this attempt to invade the rights of the creditors of the bank, by applying its property to the payment of creditors alone of the State, might tend to invalidate so much of the said Section as was intended for the benefit of the bank creditors, for, according to our view, no rights vested under it, and the enquiry is therefore immaterial.

The conclusion at which we have arrived, as to the claim of the bond and stockholders of the fire loan, under the Act of 1838, and

of their several preferences under that of 1865, renders unnecessary a consideration of the grounds of appeal submitted on behalf of the billholders and depositors, save the seventh, which is in the following words: "That whatever may have been the claims of the holders of the fire loan bonds, if the addition to the capital of the bank arising from those bonds had been left with the bank, when the State withdrew from the bank the whole amount that had been so deposited with the bank, as between the State and the bank, the primary liability for these bonds was with the State, and should have been so decreed." The claim of the holders of the fire loan bonds to a share of the assets does not arise, as we have said, by virtue of any lien or pledge made by the Act of 1838. The liability of the bank rests on the express contract it made with the bondholders, by which it guaranteed the payment of the principal and interest. The withdrawal by the State of the whole amount raised by the loan, and which had been added to the capital of the bank, cannot change the character of the guaranty, or release the bank from the obligation which it imposed. The State was the primary debtor, the bank the guarantor, and it is not easy to conceive of any proceeding or even contract between the original debtor and the guarantor, which, without the express or implied assent of the creditor, could discharge the guarantor from the liability which he has assumed.

The Attorney General, as "attorney for the President and Directors of the Bank of the State of South Carolina," and "as Attorney General of the State of South Carolina," appeals from so much of the Circuit decree as is embraced in the following words, to wit: "But if the assets shall be more than sufficient to pay the fire bondholders and the fire loan stockholders, it is further ordered and decreed that the remaining assets in the hands of the Receiver be applied *pro rata* to the payment of the holders of the bills issued by the bank, the depositors and other creditors of the bank, subject, however, to the modification hereafter made." We have not had the benefit of any argument in support of the said ground, and cannot well conceive how it can be taken on behalf of the President and Directors, who, in their answer, "admit their liability at law for genuine unpaid bills, and if in funds to pay all indebtedness, would not hesitate to pay them when presented."

In the order of the Court in this cause, of the 3d of March, 1868, the former Attorney General was made a party defendant "in behalf of the State, he being in Court and consenting, for the purpose

of sustaining the validity of the Act of 1865," and, in the answer which he filed, says that "the general obligation of the bank to redeem its bills is admitted," while he claims that the bank is bound to carry out the provisions of the Acts of 1838 and 1865. Nay, the very Act of 1865, to sustain the validity of which the Attorney General was made a party, recognizes the billholders as creditors of the bank, by applying the assets of the bank to their payment, but postponing them to the bond and stockholders of the fire loan. If we properly appreciate the point raised by this ground of appeal, it denies the right of payment from these assets to all creditors of the bank save and except those under the fire loan. If, then, the assets shall be more than sufficient for their satisfaction, what is to become of the surplus? Is it to be enjoyed by the stockholder of the bank? He can have no right but to what may remain after all the debts of the bank are paid. What then is to become of it? "Equity regards the property of a corporation as held in trust for the payment of the debts of the corporation." * * * "Stockholders are not entitled to any share of the capital stock, nor to any dividends of the profits until all the debts are paid."—*R. R. Co.* vs. *Howard,* 7 Wall., 409.

It is not perceived upon what possible ground it can be pretended that the property of a corporation having a right by charter to issue bills, and the property not bound by any lien, can be exempt from liability to meet them. The charter, as if to give additional strength to the obligation on the part of the bank, incurred by its issue, declared, in the 6th Section, that "bills or notes which may be issued by order of the said corporation, signed, &c., promising the payment of money to any person or persons, his, or her, or their order, or to bearer, though not under the seal of the said corporation, shall be binding and obligatory upon the same, in like manner, and with the like force and effect, as upon any private person or persons, if issued by him, her or them, in his, her, or their private or natural capacity or capacities, and shall be assignable and negotiable in like manner as if they were so issued by such private person or persons."

Throughout the whole argument on the part of the holders of the fire loan, although they set up priority in the fund held for distribution, it was not pretended that the bill holders, depositors and other creditors did not have a right to any of the portion which might remain, after first satisfying the claims in favor of which a preference was averred. We fail to discover a single argument

upon which such a proposition as is submitted by the said ground, can be maintained.

For the reasons given in the decree, we concur with the Circuit Judge in holding that the claimants of bills are entitled to the full amount of the face of said bills, without any regard to the price at which they may have purchased them. As to such as may have been issued by the bank under circumstances which show that they were not issued on a specie basis, they must be subjected to the same rules which apply to contracts which practically amount to Confederate transactions.

Depositors are creditors of the bank. They part with the title to their money, and loan it to the bank.—*Thompson* vs. *Riggs*, 5 Wall., 678. There may be an express contract, or one may be inferred from the attendant facts, that the title to the money deposited remained with the depositor; but if nothing is said, or done, which may vary the general rule, a mere naked deposit changes the title to the money, and at once establishes the relation of debtor and creditor. Having in view the periods at which it appears some of the deposits were made, a qualification must however be attached, that if the money deposited was not accepted by the bank, with reference to a specie basis, the depositor will be entitled, in National currency, to only so much as his deposit in such currency was worth at the time it was made.

On the part of the billholders and depositors, it is claimed, that the right of the bondholder, as creditor of the bank by reason of its guaranty, should be qualified: "1st. By compelling him to show that his claim against the State will be either delayed or denied; and, 2d. That whatever sum he takes from the assets of the bank, the other creditors will be subrogated for that sum, to the claim of the bondholder against the State."

It does not appear to us that the principles which, either at law or in equity, govern the relation between the guarantor and guarantee, can be exacted or enforced when the original debtor is a State, and beyond the reach of the process of the Courts. If the guarantor can set up a defense by reason of some failure on the part of the guarantee to pursue his rights against the principal debtor, through which has ensued a loss of some security which the guarantee held for his debt, it is on the assumption that the law has afforded adequate means to avert or prevent such loss. The process of the law, however, is powerless against the State. If it is the debtor, the arm of the Court cannot reach it. The creditor

has no security but in its faith and pledge in its sense of moral obligation and of honor.

We do not say this because we perceive that the holders of the fire loan bonds have done anything in regard to their debt against the bank, which, in anywise, deprives them of the full benefit of their guaranty, but simply for the purpose of indicating their position as to the principal creditor against whom they are without remedy through the Courts. And the inquiry is rendered entirely unnecessary, when it is remembered that the principal is the sole stockholder of the very corporation which has guaranteed the bonds.

The second ground, on which the proposition is rested, would seem to imply that the billholders and depositors have no claim against the State for what may remain unpaid to them out of the assets of the bank, a position entirely inconsistent with that assumed both in the bill and throughout the argument. If they and the bondholders have valid and subsisting demands against the State, for the amounts unpaid, by reason of the insufficiency of the bank assets to meet the whole, what additional security would the billholders and other creditors have by being subrogated to the claim of the bondholders for the sums which they may receive of the said assets?

In marshalling securities, "the general principle is, that if one party has a lien on, or interest in, two funds, for a debt, and another party has a lien on an interest in one only of the funds for another debt, the latter has a right in equity to compel the former to resort to the other fund, in the first instance, for satisfaction, if that course is necessary for the satisfaction of the claims of both parties wherever it will not trench upon the rights or operate to the prejudice of the party entitled to the double fund."—1 Story Eq., § 633; *Walker* vs. *Covar*, 2 S. C., 16.

The reason of the rule ceases where both the parties have a like and equal claim to both the funds, and such we regard the condition of all the creditors of the bank.

By the charter of 1812, "the faith of the State was pledged for the support of the bank, and to supply any deficiency in the funds specifically pledged, and to make good all losses arising from such deficiency." The pledge for the support of the bank involves an obligation on the State, which had the supervision and control of its management to hold its capital and profits always ready to meet the liabilities, which, by virtue of its establishment, it had a right to incur; the engagement "to supply any deficiency in the funds

specifically pledged," was an undertaking that, in the event of a failure of the capital furnished (and referred to by the designation of " the funds specifically pledged,") to respond to the debts incurred by its own corporation, the State would make good "the losses" which might ensue. As if to leave no room to doubt the real purpose and intent of the pledges so made, the sixth Section of the charter, wherein the State limits the debts which the bank shall at any time owe, and makes the Directors, in whose term an excess may happen, liable in their private capacities, nevertheless provides that such liability of the President and Directors shall not be construed to exempt the bank, or its property, from liability for such excess, nor their insufficiency to exempt " the State of South Carolina from being also liable for, and being chargeable with, the said excess," the State here actually announcing its liability for debts of the bank, contracted in express disregard and violation of the charter.

In the opinion of the Constitutional Court, delivered in 1822, in the case of *The State* vs. *Billis*, 2 McC., 20, it is conceded that the faith of the State is pledged by the charter, in case of the insolvency of the bank, for the redemption of its notes. From the day of its establishment to the present moment, there has never been evinced a disposition on the part of the State, even by intimation, to repudiate its liability for the debts of the bank. The whole course of its legislation exhibits a contrary intent.

The moneyed relations between the bank and the State might well be said to have identified them. In fact, the treasury played but a secondary part in the financial affairs of the State. The bank was its cashier. By the Act of 1819, 6 Stat., 136, all payments by the Treasurers of the Upper and Lower Divisions were to be by drafts or checks upon the bank, while, on the other hand, by the same Act, no payment of money was to be made by any public officer in any other manner than by check or draft on the bank, " so as to make it indispensably necessary for such public officer to deposit his money in such bank, or its branches, previous to his making such payment."

The State, from time to time, raised loans, by the issue of stock and otherwise, and pledged not only its own faith but the capital of the bank and its annual profits for the payment of the interest, and the final redemption of such debts.

To refer to the many reports of the President and Directors, and of the Committees of the Legislature appointed to examine into and

report on the condition of the bank, which directly admit the liability of the State for the debts of this corporation, established " on behalf of and for the benefit of the State," would only encumber this opinion with a repetition of the acknowledgment, never questioned, denied, or even qualified by a single Act or Resolution of the General Assembly.

A reference to one or two will suffice, for as was said in the argument, " the language of one report is the language of all." In the report of the Committee made to the Legislature in December, 1841, (Bk. Comp., 221,) it is said, " and the extraordinary security for the management of the bank is contained in these words, ' the faith of the State is hereby pledged for the support of the said bank, and to supply any deficiency in the funds specifically pledged, and to make good all losses arising from such deficiency.' Thus this institution has in reality the whole resources of the State as its stay and support. It cannot fail in any event, though the State may suffer." In the report of the Committee made in 1847, (Bk. Comp., 311,) it is said, " There are some very peculiar features in the constitution of this Bank of the State, which it seems to your Committee not amiss at this time to bring more particularly to the view of your honorable body. This bank is in many respects an independent treasury. The funds of the State are in effect kept by herself, or by a corporation entirely under her control; * * * * * her assets are in her own vaults, and only to be used, so far as the theory of the establishment is concerned, for the benefit and at the will of the State." In the examination of the President of the bank, which accompanies the report, he says: "Beyond those resources which the bank has within itself to convert its notes into coin, the State has added its pledge, in case of its failing, that it will pay off all its liabilities." The Legislature, by a Joint Resolution, approved September 25th, 1868, raised a Committee of three " to enquire into the assets and liabilities of the bank," with instructions " to enquire into and report for what debts of said bank the State is liable."—14 Stat., 158–9. On December 18, 1868, the report was made, in which it says that " it (the bank) really and in fact had no independent existence from the State, but was really subject to and controlled by it. Truly it had a legal entity for business purposes, but was really nothing more nor less than the State engaged in banking business. The debts, therefore, of the bank, created during as well as prior to the existence of the rebel-

lion, were liabilities incurred in the name and on behalf of the State."—Rep. and Res. of 1868, 14 Stat., 221.

The report proceeds to discriminate between the bills issued prior to and during the war, and as to the latter, holds them subject to the prohibition of the Constitution against " debts contracted in behalf of the rebellion," to which objection (passed upon by the Circuit decree) we shall hereafter refer. The General Assembly, by Act approved September 15, 1868, 14 Stat., 22, provided for the funding of the bills issued prior to December 20, 1860, in bonds of the State, with interest at 6 per cent., the interest payable semi-annually, and the principal to be redeemed within twenty years after the date of the bonds, provided they were presented to the Treasurer before January 1, 1869. The decree pronounced in the case before us puts all the bills on the same footing, without regard to the date of their issue, holding that they are not affected by the amendment to the Constitution of the United States forbidding the payment by the seceding States of the debts contracted in aid of the war. If they are not subject in this regard to the prohibition in the amendment of the Constitution of the United States, they are free from the objection to the same effect in the Constitution of the State, and there being no appeal from so much of the said decree as holds them exempt from such inhibition it stands as the judgment of the Court.

The liability of the State for all the debts of the bank does not rest alone on its charter and the legislation which has so identified the State with the institution as to make it not only its monetary agent, with power to contract debts on its account, but its creature.

The Circuit decree rules as a question of fact, (and one which has not been disputed in the whole course of the long litigation,) " that the State has drawn from the bank not only the whole amount arising from all sources which it ever contributed to its capital, with interest thereon, but is largely indebted to the bank besides."

If the bank had been a corporation representing private stockholders, and on the dissolution, its stock, or the money arising from the sale and transfer of it, had been distributed among them, " the established rule in equity is, that such holders take the fund charged with the trust in favor of creditors, which a Court of equity will enforce, and compel the application of the same to the satisfaction of their debts."—*Railroad* vs. *Howard*, 7 Wal., 410, and the cases referred to. It is because the capital stock of a corpora-

tion constitutes a trust fund for the payment of its debts. If, then, the whole capital of this bank, with the interest on it, has not only been withdrawn from the corporation by the single stockholder, but he is found to be largely indebted to it, and the assets which remain are not sufficient to satisfy its outstanding liabilities, he must restore a sufficient amount to meet them. The property of the corporation must first respond to its debts.

The case of *Curran* vs. *Arkansas,* so often referred to in the argument, directly applies to the aspect of the case now under consideration. The other points made involved the question of preference among the creditors of the bank. This affects the relation of all of them to the stockholder, who has absorbed the whole capital, leaving them unpaid, and as was held in *Curran* vs. *Arkansas,* if the charter of a bank set apart a fund as capital, out of which debts are to be paid, it amounts to a contract with those who become creditors on the faith of it, that such fund thall not be diverted to other purposes.

That the State was the sole owner of the capital stock does not at all vary the relation of the bank to its creditors.

The State, as a stockholder, carried no attribute of its sovereignty to this corporation, for whose engagements it became responsible.—*The State* vs. *President and Directors of Bank of South Carolina,* 1 S. C. R., 77. It is true that it is beyond the reach of any remedy that can be enforced by the process of the Courts, but this only adds additional weight to the moral obligation. In this case, it is not at least weakened by the fact that its own legal officer, with his consent, was made a party on behalf of the State, for the purpose of sustaining an Act by which the State undertook to dispose of the assets of the bank, its outstanding notes being specifically included among them, or that it afterwards admitted its liability for all the bills issued prior to December 20, 1860, in providing for their payment by its own assumption. The Circuit Judge, in his decree, says : " In this case, the State has of its own will submitted to its Courts the decision of the issues involved. At the hearing, it was so announced by the Attorney General then representing the State."

Not only has the present Attorney General directly, on the part of the State, submitted to this Court, by his appeal, errors in so much of the decree as directs the application of any of the assets of the bank, after paying the fire loan bond and stockholders, to the

payment of the bills, but " an argument on behalf of the State " was heard from assistant counsel employed.

As was said by the Senior Associate, Mr. Justice Willard, in the case of *The State* vs. *The President and Directors of the Bank of the State of South Carolina*, to which we have referred, " the State can neither be sued nor compelled to appear in its own Courts. When it enters the Court it does so voluntarily, and it is to be presumed, for the reason that some important object cannot be obtained except through the judicial arm of the Government." The judgment of the Court cannot bind the State. It may be the medium, however, when the State is in the position of a party before it, of informing it of the rights which its own acts confer on others, and the obligations which, by reason thereof, rest upon it.

It is ordered and decreed, that so much of the Circuit decree as gives a preference to the fire loan bondholders and fire loan stockholders, in the payment to be made out of the assets of the bank, be set aside.

That the said assets be held for distribution among all the creditors of the bank in rateable proportion to the amount of their respective debts; any collaterals or securities held by any of such creditors, for or on behalf of the bank, to be accounted for by them.

That the claims by holders of bills of the bank, issued since Dec. 20, 1860, be subject to the conditions in this opinion expressed in relation to them.

That in taking the account of claims by depositors, the value in national currency to which they may be severally entitled, shall be assessed by the Circuit Court, not only with regard to the time at which the respective deposits were made, but to the facts and circumstances, (if any,) through which any contract, express or implied, may have been created between the bank and the depositors as to the money value for which the bank was to be liable on account of such deposits.

That such parts of the Circuit decree as may not be inconsistent with the judgment of the Court, as expressed in this opinion, are confirmed.

That the case be remanded to the Circuit Court, for such orders as may be necessary to give effect to the judgment of this Court; the question of costs reserved for future decision by the Circuit Court.

*Willard*, A. J., and *Wright*, A. J., concurred.