March 15, 1928. The opinion of the Court was delivered by
This is one of the many controversies which have resulted from the "tangled web" of the affairs of the American Bank Trust Company, an insolvent banking corporation now in the hands of a receiver.
Two main questions are involved in this appeal: (1) Whether the Bank of Aynor is entitled to a lien upon certain securities of the American Bank Trust Company alleged to have been set apart by the officers of that bank to secure certain obligations, and, after the failure of the bank, delivered by the state bank examiner to the officers of the Bank of Aynor; and (2) whether, regardless of this claimed lien, under the circumstances of the case, the Bank of Aynor, as the cestui que trust of a trust ex maleficio on the part of the American Bank Trust Company, is entitled to a preferred claim upon the assets in the hands of the receiver of the American Bank Trust Company.
The American Bank Trust Company, pursuant to Section 3981, Vol. 3, Code of Laws 1922, was taken over by the State Bank Examiner, on the morning of Saturday, June 26, 1926, not having opened for business after the usual closing *Page 149 
hour the day before, Friday, June 25th; and, on July 19th, James E. Peurifoy was appointed receiver of its assets under an order of the Court passed in the main cause above stated of Rice et al. v. City of Columbia et al.
At the time of the failure of the American Bank Trust Company, the Bank of Aynor had to the credit of its deposit account in that bank, the sum of $27,713.38, an open, unsecured checking account, and also had a claim against it for $44,189.38 on account of the appropriation of the proceeds of certain Horry County notes which had been left with the bank for sale under the circumstances which will be later detailed.
The issues in this particular matter arise out of a petition filed by the Bank of Aynor, on August 10, 1926, by way of intervention in the main cause, in which it claims a preference, in the administration of the assets of the defunct bank, to the extent of $44,189.38 and interest, and a lien upon certain securities alleged to have been assigned and delivered to it by the American Bank Trust Company as collateral security to its obligation amounting to said sum.
The receiver contests both claims of the Bank of Aynor upon various grounds: That there was no assignment of the securities until after the Bank Examiner took charge of the bank; that the Bank Examiner was without authority to deliver the securities to the Bank of Aynor; that, at the time of the alleged assignment of securities, the American Bank Trust Company was insolvent, and that the attempted assignment constituted an unlawful preference; that the Bank of Aynor is not entitled to a preference in the administration of the assets, and gave notice of a motion to have Holliday, president of the Bank of Aynor, made a party defendant. This motion was refused.
The matter came on to be heard before his Honor, Judge Dennis, upon testimony and evidence taken before him in *Page 150 
open Court at November term, 1926. Later (the order is not dated, but presumably was made shortly before the exceptions were filed in March, 1927), his Honor, Judge Dennis, filed with its styled "Order for Judgment" in which he held that the assignment of the securities was intended as collateral security to both the amount received by the American Bank Trust Company upon the Horry County notes and the amount of the deposit to the credit of the Bank of Aynor with the American Bank 
Trust Company; that it was valid as to the proceeds of the notes, but not as to the deposit; and that, consequently, "the proceeds of these securities should be divided between the Bank of Aynor and the receiver of the American Bank Trust Company in the proportion that the proceeds of the Horry County notes and the old deposit account bear to the total amount of securities. In other words, there was realized from the sale of the Horry County notes $44,189.38, and the total amount of securities is $73,241.23. The receiver should, out of the amount realized from these securities, share with the Bank of Aynor in the proportion that $44,189.38 is to $27,713.38." What he meant was that, out of the $73,000 of securities, the receiver should have (in round numbers) 27/71 and the Bank of Aynor 44/71; or, precisely in percentages, the receiver 38.55 per cent. and the Bank of Aynor 61.45 per cent.
From this decree both the Bank of Aynor and the receiver have appealed: the Bank of Aynor, upon the ground that the assignment of the securities should have been held as collateral to the obligation arising from the appropriation of the proceeds of the Horry County notes alone (it making no claim in reference to the deposit); and that the Bank of Aynor is entitled to a preference to the extent of the $44,189.38 in the administration of the assets of the bank: the receiver, upon the grounds of his contest above stated.
The facts bearing upon the interesting controversy appear as follows: *Page 151 
At the time of the closing of the bank, the petitioner, Bank of Aynor, had on deposit with it $27,713.38; it was an inactive account, having continued for quite a while, with very few deposits or withdrawals. This deposit does not constitute the main point of controversy between the receiver and the Bank of Aynor, as will be explained.
The main point of controversy grows out of a transaction between the Bank of Aynor and the American Bank Trust Company, which occurred in this way: The Bank of Aynor held certain notes of Horry County, dated June 16, and June 21, 1926, in the aggregate sum of $45,000, which had been issued to fund other Horry County notes which were to mature on June 28th. It appears, although not distinctly stated, that the Bank of Aynor held the other notes referred to, and was anxious to have the new notes converted into cash that the other notes might be liquidated, and that some other creditor than itself should carry the burden.
On the morning of Monday, June 21st, Hagood, vice president of the Bank of Aynor, went to Columbia for the purpose of getting the American Bank Trust Company, through Matthews, chairman of the board of directors, to negotiate a sale of the new notes, and make immediate remittance of the proceeds to the Bank of Aynor, so that the old notes might be liquidated on June 28th. Hagood found that Matthews was out of the city, and conferred with Mauldin, the president, who advised him to await the return of Matthews. Hagood left the notes with Mauldin for safe-keeping, and took from him a simple receipt, acknowledging the receipt of the notes, but making no statement in reference to the matter. On Tuesday morning, the 22d, Hagood returned to Columbia, and conferred with Matthews in regards to the sale of the notes, informing him that a prompt sale and remittance were necessary to meet the old notes maturing on the 28th. Hagood did not have *Page 152 
with him the resolutions of the county board authorizing the issuance of the notes, referred to as "the supporting papers." Matthews told him that he would send the notes to New York for sale, but that it would probably be necessary to have the "supporting papers" before the sale could be consummated, and that he would notify the New York brokers that they would go forward promptly. It appears that at this time (Tuesday, the 22d), Matthews had already done what he then said he would do, forward the notes to New York. Mauldin had told Hagood upon his first visit on Monday, the 21st, that Matthews was out of the city, but would return that afternoon; and there was in evidence a letter from the American Bank Trust Company to Curtis Sanger (New York brokers), dated June 21st, inclosing the Horry County notes, with the request that the proceeds (the face less discount) be deposited with the National City Bank of New York to the credit of the South Carolina National Bank, against which the American Bank Trust Co. might draw in checks upon the South Carolina National Bank.
On June 22d Mauldin carried the Horry County notes over to the South Carolina National Bank, showed them a telegram from Curtis Sanger, New York brokers, confirming the purchase by them of the notes, and requested the South Carolina National Bank, upon the faith of that telegram, to take over the notes, give the American Bank Trust Company immediate credit for them, and forward the notes to Curtis Sanger. The request was declined.
It is manifest that the American Bank Trust Company, failing to get their eager hands, immediately, upon this fund, in which they had no earthly interest, then forwarded the notes to Curtis Sanger under their letter of June 21st, which had not been mailed, with the instructions above stated.
On June 24th (Thursday), Holliday and Hagood returned to Columbia, carrying with them the "supporting *Page 153 
papers" to the Horry County notes, which they delivered to Matthews, who stated to them that no report had beenreceived in reference to the notes, and that the sale had notbeen consummated, although two days prior thereto, on June 22d, a telegram had been received, as stated, from Curtis Sanger confirming the sale, and Mauldin had carried the notes over to the South Carolina National Bank, and shown them the telegram.
On the same day, the 24th, whether before or after the visit of Holliday and Hagood does not clearly appear (Thursday), the National City Bank wired the American Bank Trust Company and the South Carolina National Bank that they had credited the South Carolina National Bank, as directed by Curtis Sanger, with the proceeds of the Horry County notes, $44,189.38. The South Carolina National Bank then credited the account of the American Bank Trust Company with said amount, which, during that day and the next, the last day of its existence, was checked against by the American Bank Trust Company. It is uncertain from the transcript of record what was the balance to the credit of the American Bank Trust Company on the books of the South Carolina National Bank at the time the Bank Examiner took over the former; Earle, the cashier of the American Bank Trust Company, states that it was about $18,000; Edwards, vice-president of the South Carolina National Bank, states $10,740.95. It is certain that, whatever was the amount, it represented in part at least the proceeds of the Horry County notes.
So much for the distressing machinations in connection with the trust of handling the Horry County notes, the proceeds of which were never intended to become a part of the assets of the American Bank Trust Company, but which became so by a studied scheme of appropriation and concealment.
The facts in reference to the assignment of certain securities to protect the Bank of Aynor from loss on account of *Page 154 
the handling of the Horry County notes appear to be as follows:
On Friday morning, June 25th, the last day of the bank's existence, Matthews called Holliday over the phone, and told him that they were thinking of consolidating the American Bank Trust Company with another bank, and advised him, as a director, to come to Columbia. Holliday and Hagood then went to Columbia, arriving there about noon on Friday. Matthews told them that the Horry Countynotes had not been sold, despite the facts of the telegram from Curtis Sanger of the 22d, of the telegrams from the National City Bank of the 24th, and of the withdrawal of practically all of the proceeds of the notes by the American Bank Trust Company from the deposit to its credit in the South Carolina National Bank.
Covering his conscious deception in the statement that the notes had not been sold, after he had received and appropriated nearly all of the proceeds of the sale, Matthews stated to Holliday and Hagood that he had set aside securities to take care of the transaction then in process of consummation, as he represented, when, as a fact, it had been already consummated. He showed them a package of securities aggregating $73,241.23, marked "Bank of Aynor Securities," and named some of the papers which were included in the package. Holliday told him to put the securities in the vault and take care of them for him. They were afterwards delivered by the Bank Examiner to Holliday, who receipted for them on June 28th, although the receipt, admittedly in error, is dated June 24th.
It does not appear exactly when Matthews set aside the package of securities and labeled it as stated. It is possible, and very probable, that it was done at the time that Matthews, in his desperation to raise funds to save the sinking ship, conceived the design to commit this most flagrant breach of trust. It is hardly conceivable that he would have *Page 155 
committed an act which, in the absence of some provision for the protection of the Bank of Aynor from his willful misappropriation of the proceeds of the notes, would have amounted to a bare-faced theft. And, while the act was an inexcusable breach of trust, it would to some extent mitigate the offense, by presuming in favor of his intention not to defraud, that at the moment of temptation his better nature suggested the protection against his breach of trust which a consecration of the securities would afford.
Unquestionably, if the securities had been pledged by mutual insistence and concession at the time the notes were left with the American Bank Trust Company for negotiation in New York, the transaction would have been upheld. We see no reason why the same result should not follow if voluntarily done by the pledge under the circumstances detailed, even without the knowledge or insistence of the Bank of Aynor.
The American Bank Trust Company, in this transaction, recognized the fact of the existence of a trust and a violation of it; the proceeds of the notes which they misappropriated were never entered upon their books as a credit upon the account of the Bank of Aynor, as would have been done if the transaction had been considered as a deposit.
The testimony is perfectly clear that the securities were set aside some time prior to the conference between Mr. Matthews and Messrs. Holliday and Hagood on Friday, the last day of the bank's existence. In view of the trust relation between the parties, the setting aside of these securities was entirely proper, and any other course would have been the grossest kind of breach of trust. It is true that the action of some of the officers of the American Bank is not above censure, in that they did not inform the officers of the Aynor Bank of the receipt and use of the money. At the same time, the securities were set aside with the proper intention of protecting the Aynor Bank in an entirely lawful *Page 156 
manner, because there was a present fair consideration for the securities.
The case of Cook v. Tullis, 18 Wall, 332; 21 L.Ed., 933, in which the opinion was delivered by the distinguished Mr. Justice Field, is decidedly applicable to the case at bar. In that case a private banker had purchased bonds for Tullis which were left with the banker for safe-keeping, and were kept in an individual deposit box. The banker used some of these bonds without the knowledge of the owner, and substituted therefor bills receivable. The owner was held entitled to the bills receivable upon the bankruptcy of the banker, although the owner was not aware of the substitution of the note and mortgage for the bonds at the time the substitution was made. He did, however, subsequently ratify the transaction. Mr. Justice Field held that the trust attached to the note and mortgage; the same having been substituted for the bonds. He says:
"It cannot alter the case that the newly acquired property, instead of being purchased with the proceeds of the original property, is obtained by a direct exchange for it. The real question in both cases is, what has taken the place of the property in its original form? Whenever that can be ascertained, the property in the changed form may be claimed by the original owner of the cestui que trust, and assignees and trustees in bankruptcy can acquire no interest in the property in its changed form which will defeat his rights in a court of equity."
Nothing that has been said is intended to impinge upon the decision heretofore rendered involving the abstraction of the assets of the bank by the City of Columbia and others; a different situation is here presented.
But, even if the assignment of the securities cannot be sustained, the Bank of Aynor would be entitled to priority in the distribution of the assets of the bank, for the reason that, under the circumstances detailed, the funds to *Page 157 
which it was entitled became, in the hands of the American Bank Trust Company, a trust fund, which were appropriated by the officers of the American Bank Trust Company to the uses of the bank, under circumstances which, in the absence of protection to the Bank of Aynor, constituted a breach of trust with fraudulent intent, practically a theft, which inured to the benefit of the American Bank Trust Company; ex equo et bono the obligation is upon the receiver to make restitution thereof out of the entire assets of the insolvent bank, in priority to the claims of depositors and general creditors.
The circumstances disclosed a woeful series of purposeful deception and concealment, with a premeditated design to appropriate to the uses of the floundering vessel funds committed to its keeping for a specific and immediate purpose. The officers of the Bank of Aynor did not expect to make a sale of the notes to the American Bank Trust Company; they expected to engage its good offices simply in negotiating a sale through or to brokers in New York. They impressed upon both Matthews and Mauldin the urgency of prompt action and prompt remittance in order to meet notes maturing in a few days. It was never contemplated that the American Bank Trust Company should be the depository of the funds for a day. As late as June 25th, the day before the Bank Examiner took over the bank, the officers of the Bank of Aynor were assured that the notes had not been negotiated, although on the 22d the American Bank Trust Company had been notified by wire that the trade had been consummated; on June 24th, had received wires that the proceeds had been deposited with the New York bank to the credit of the South Carolina National Bank, and had practically checked out all of it. So keen were the officers of the American Bank Trust Company to get hold of the $45,000 that they attempted on June 22d, before they forwarded the notes to New York, to anticipate *Page 158 
the program outlined in their letter of June 21st by having the South Carolina National Bank to act upon the telegram of Curtis Sanger, and pass the amount immediately to the credit of the American Bank Trust Company. In less than 24 hours after receiving the wires of June 24th, practically all of the deposit with the South Carolina National Bank had been exhausted, and all the while, up to an hour after the bank had made its last gasp on the 25th, giving assurance to the officers of the Bank of Aynor that no money had been passed, information of which was received by them late that day from the cashier who had not been handling the transaction.
The authorities are much divided upon this question. Many of them, and we must admit a decided majority of the decided cases, are to the effect that, even in cases of fraudulent misappropriation of trust funds which entered into the assets of an insolvent corporation, the beneficiary of the trust is not entitled to priority over general creditors in the distribution of assets by a receiver, unless he can show that the trust funds have been received by the receiver — he must be able to trace the funds — to establish a res upon which the trust may operate. (See extended note upon the subject in L.R.A., 1916-C, 21, particularly at page 53.)
Other cases from courts of the highest respectability take a different view, and accord the right of priority in the distribution of the assets of the receivership estate, not upon the ground that assets sufficient to respond to the obligation have reached the hands of receiver, but that the misappropriated funds have reached the coffers of the corporation before receivership, and have been used for its benefit.
The minority rule appeals most strongly to our sense of equity and justice. We do not think that the cases which enforce the majority rule draw the very material distinction between an ordinary constructive trust and a constructive trust ex maleficio. In the former class of trusts, the *Page 159 
title has properly passed to the trustee, and it has very properly been held that one who seeks to impress a trust upon a certain fund must of necessity point out the fund — there must exist the res upon which the trust is to be impressed. It is therefore perfectly logical, as held in the cases of White v. Bank, 60 S.C. 122; 38 S.E., 453, and Citizens Bank v. Bradley, 136 S.C. 511;134 S.E., 510, that in cases of receivership the beneficiary must show that funds have come into the hands of the receivership upon which the trust is to be declared. The beneficiary of a simple constructive trust is no more than an ordinary creditor, except where he can point to a fund in the hands of the receiver upon which his asserted trust is to operate. Otherwise, to allow the trust would grant him a preference over other creditors who possess an equity equal to his.
But the case is quite different from a constructive trustex maleficio. There the trustee has acquired no more title to the misappropriated fund than a thief would have acquired. As a matter of law and morals he occupies that detestable position; and the beneficiary occupies a much more favorable position than that of the general creditors or the beneficiary of a simple constructive trust. If it can be shown, therefore, that the misappropriated fund went into the coffers of the corporation prior to receivership, was disbursed by the corporation in the payment of its debts or in the acquisition of property, there can be no reason or justice in allowing the general creditors to receive the benefit of the stolen property, simply for the reason that a corresponding amount of money was not turned over to the receiver. The corporation will have received the benefit of the stolen fund by the reduction pro tanto of its liabilities; the general creditors should not be heard to say that they may hold on to the benefit of the theft and not account for it.
Another matter: It is unquestionably the law that a receiver can acquire no other greater or better interest than *Page 160 
the debtor had in the property and assets committed to his care; he is clothed with all the powers which the debtor possessed, and is subject to his obligation; he has been held "to stand in the shoes of the debtor." 34 Cyc., 191; In reAmerican Co., 125 S.C. 214; 118 S.E., 303; Carroll v.Cash Mills, 125 S.C. 332; 118 S.E., 290.
In this particular case, if there had been no insolvency, no appointment of a receiver, and it appeared that the officers of the bank had willfully and fraudulently violated their trust with reference to the notes, had turned the proceeds of sale into the coffers of the bank, and had disbursed them in the payment of the debts of the bank, could there be a doubt that the entire assets of the bank could be held for a restitution of the misappropriation? If not, it seems clear that the receiver who could acquire no higher rights than the corporation, and was subject to its obligation, must respond in like manner.
In a note to L.R.A., 1916-C, at p. 53, it is said:
"But, reasoning from the basic principle that no trustee, by a breach of his trust, can gain a title to the subject of the trust, and can transmit none of an executor, administrator, assignee for creditors, or a receiver, in sundry cases the courts have decreed the repayment of misappropriated money which was held in trust, or the proceeds or value of converted trust property out of the general estate of an insolvent trustee without requiring proof that the subject of the trust was specifically contained or represented in the estate."
Quite an interesting case along this line, from the Idaho Supreme Court, is reported. State of Idaho v. Bruce,17 Idaho, 1; 102 P., 831; L.R.A., 1916-C, 1; 134 Am. St. Rep., 245. There the state treasurer deposited state funds in a bank without authority of law. The bank had notice of the character of the funds and of the relation which the depositor sustained to the funds. The trust funds were commingled with the general assets of the bank, and used in *Page 161 
the payment of the debts of the bank; the bank suspended, and went into the hands of a receiver, and, at the time thereceiver took charge, there was not enough cash on hand topay the trust account. It was held that the claim of the State attached to all the assets of the bank as a preferred claim for the payment of the trust funds.
The Court said:
"The money deposited by the state treasurer was the property of the State, and the bank knew that fact at all times it was dealing with this fund. It is conceded that it went into the general funds of the bank, and was paid out from day to day, together with general deposits, on the checks of depositors and in the purchase of securities and other assets. No pretense is made by the bank or its receiver that this money was embezzled, stolen, or dissipated. It was used in the due course of business as transacted by the bank. It is also conceded that no part of this fund can be traced into any particular securities, paper, or assets. The bulk of it was doubtless paid out on depositors' checks during the closing days the bank did business, and while it was struggling to maintain its credit and continue in business. We fail to see what difference it can make in point of fact, reason, or law whether the money was used in buying bonds, mortgages, and other paper to add to the general assets of the bank, or in discharging the debts of the bank. In either event, it adds to or appreciates the body and value of the bank's assets. If the money is used today to pay the bank's debts, and it suspends business tomorrow, the indebtedness of the bank tomorrow will be just as much less than it would otherwise have been as the amount paid out represents. The assets of the bank are worth more when the bank's debts amount to only $500,000 than when they amount to $600,000. So it was in this case. The assets of the bank in the hands of the receiver are worth more to the general creditor with the debts reduced in the sum of *Page 162 
$60,000 by the disbursement of these trust funds than they would have been had that amount of debts not been paid before the bank went into insolvency."
In the opinion of the writer, the Bank of Aynor is entitled to realize upon the pledged collateral to the extent of $44,189.38, with interest at 7 per cent. from June 24, 1926, or to be paid as a preferred creditor out of the assets of the bank in the hands of the receiver. In this opinion Mr. Justice Stabler concurs.
Mr. Justice Carter dissents from the conclusion that the bank is entitled to preference out of the general assets, but agrees that it is entitled to a lien upon the assigned securities, in which opinion the Chief Justice concurs. The Court accordingly is unanimous upon the contention of the Bank of Aynor as to its lien upon the assigned securities but divided upon the other (Mr. Justice Blease being disqualified). In view of the fact that the Court, composed of four justices, is equally divided upon the right of the bank to preference, that question is left open for future decision, in the event that the bank cannot realize its debt out of the assigned assets. The judgment of this Court is that the decree of his Honor Judge Dennis be modified as indicated herein.
MR. JUSTICE STABLER concurs.
MR. JUSTICE CARTER concurs in part.