## 13350

BRADLEY, STATE BANK EXAMINER, v. GUESS *ET AL.*

(163 S. E., 466)

*Messrs. S. G. Mayfield* and *W. C. Wolfe,* for appellant,

*Messrs. B. D. Carter* and *Kearse & Kearse,* for respondent,

*Mr. J. W. Crum,* for plaintiff respondent,

February 11, 1932.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

On petition for rehearing, and before the regrettable attack of illness which prevents his further participation in the decision of this case, Mr. Justice Cothran wrote an opinion which, in part, is as follows:

The appeal in this case was argued at the April term, 1930, and on September 15, 1930, an opinion was filed reversing the decree of the Circuit Court, except in certain particulars noted, and remanding the case for further pro-

ceeding. Thereafter, upon a petition for rehearing filed by the defendant Guess, a reargument of the appeal was ordered which was had at the December term, 1930. The following opinion is filed as a substitute for the opinion heretofore filed, which latter opinion is withdrawn:

The Bank of Denmark, a banking corporation under the laws of South Carolina, was closed by the State Bank Examiner on April 21, 1925, pursuant to the statute, and later, under Section 3985 of the Civil Code, the bank examiner, W. W. Bradley, was appointed, by order of Court, receiver of that institution and directed to wind up its affairs as an insolvent corporation.

In the course of the administration of his trust, it appeared to the receiver expedient to have the Court determine a controversy that was flagrant, between the creditors of the bank and one James B. Guess, Sr., in reference to the validity of the assignment by the bank to Guess of a certain mortgage executed by one Leda K. Mayfield to it, and of certain mortgages executed by the bank to Guess, which assignment and mortgages were intended as collateral security to a note given by the bank to Guess for $56,000.00, dated March 16, 1924, due November 1, 1924, with interest from date at 4½ per cent. per annum.

Accordingly, this action was instituted by the receiver on September 3d, 1925. The defendants are Guess, various creditors of the bank, and one D. P. Folk, as the representative of the stockholders, the depositors, and the creditors generally.

The defendant Guess in his answer contends that the assignment and the notes and mortgages are valid securities in his hands. The defendant Folk in his answer and in his reply to the answer of Guess contends that the securities are void, as having been given by an insolvent corporation, in unlawful preference to the alleged creditor Guess, and as fraudulent under the Statute of Elizabeth.

The case from the pleadings, the complaint, the answer of Guess, the answer of Folk, and the reply of Folk to the answer of Guess, has a most unusual presentation. If the controversy should be settled in favor of the contention of Folk, the result would inure to the benefit of the receiver's estate, and the stockholders, depositors, and other creditors would profit by the increased assets to be distributed by the receiver; and yet an examination of the complaint shows that the receiver is upholding the contention of Guess. The issues are really made up by the answer of Guess, the answer of Folk, and his reply to the answer of Guess.

The case was referred to the master of Bamberg County, to take the testimony and report the same. The matter then came up for hearing before his Honor Judge Bonham, at the Spring term, 1929, and on September 4, 1929, he filed a decree deciding all issues in the case in favor of the defendant Guess. From this decree, the defendant Folk has appealed.

We find the facts in the case to be as follows: Many of them are uncontroverted; many are set forth in the complaint; some are controverted; so far as the controverted facts are concerned, the following statement is intended as an adjudication of the questions of fact at issue:

In the spring of 1920 the defendant Guess, who was a stockholder and depositor, though not at that time an officer of the bank, deposited for safe-keeping with the bank of Denmark Liberty bonds of the par value of $56,000.00 (variously stated in the record as $56,000.00, $57,000.00, and $57,100.00); the deposit was marked in his name as a personal, special deposit, and placed in the vault of the bank where its money was kept; the cashier, however, had access to them, and by direction of Guess was accustomed to clip the interest coupons and pass them to the credit of his deposit account; at some time in the fall of 1920 the cashier of the bank, Wiggins, who was also vice-president, and appears to have been actively and almost solely in charge of its affairs, without the knowledge or consent of Guess,

abstracted from its place the $56,000.00 of bonds, and nego-
tiated for the bank loans with certain other banks, depositing
the bonds as collateral. On . . . . . . . ., 1920, he negotiated a
loan with the Hanover National Bank of New York for
$22,000.00, and deposited as collateral $26,000.00 of the
Guess bonds; on . . . . . . . . ., 1920, he negotiated a loan with
the Palmetto National Bank of Columbia for $21,000.00,
and deposited as collateral $25,000.00 of the Guess bonds;
on . . . . . . . . ., 1920, he negotiated a loan with the Bank of
Charleston for $4,700.00, and deposited as collateral $6,000-
.00 of the Guess bonds.

In May, 1921, Guess, in order to make certain financial
arrangements of his own, called for the bonds, and was in-
formed by Wiggins that he had used them as collateral to
loans he had negotiated for the bank. This information does
not appear to have raised the furor that might reasonably
have been expected; and it was promised by Wiggins that
he would substitute other collateral in the place of the bonds
and restore them to Guess, and that, failing to do so in a
reasonable time, he would see that Guess was secured to the
extent of the value of the bonds; this promise on his part
appears to have been confirmed by the directors at a meeting
called soon after the information had reached them of the
abstraction; and that in the meantime the bank regularly
passed to the credit of the deposit account of Guess the in-
terest which he would have received from the bonds; this
was in May, 1921. Wiggins continued in active charge of
the bank, and Guess appears to have confided in the assur-
ance that he would be protected.

At that time the Bank of Denmark held bonds secured by
mortgages upon the Sanford, Williams, and Spiers lands,
and the understanding appears to have been that these bonds
and mortgages and a bond and mortgage of Mrs. Leda K.
Mayfield would be assigned to Guess to indemnify him.
Nothing definite, however, was done to carry out this under-
standing, and later the mortgages upon the Sanford, Wil-

liams, and Spiers properties were foreclosed and the mortgaged properties bid in by the bank to which titles were made by the master.

On August 4, 1923, nothing in the meantime having been done by or for Guess, in the way of his protection, the Palmetto National Bank sold the $25,000.00 of bonds (which had been pledged by Wiggins to secure the note given to it), for $24,760.41, paid off the note, and passed the surplus to the credit of the Bank of Denmark.

On March 13, 1924, the Hanover National Bank sold the $26,000.00 of bonds (which had been pledged by Wiggins to secure the note given to it) for $26,136.32, paid off the note, and passed the surplus to the credit of the Bank of Denmark.

On May 30, 1924, the Bank of Charleston sold the $6,000.00 of bonds (which had been pledged by Wiggins to secure the note given to it) for $6,315.42, paid off the note, and passed the surplus to the credit of the Bank of Denmark.

In the meantime, in December, 1923, Cox who had been president and director of the bank, resigned; W. L. Riley was elected president, and the defendant Guess was made a director.

After it had been learned that the bonds pledged to the Palmetto National Bank and to the Hanover National Bank had been sold, and that it was no longer possible for the bank to return them to Guess, the directors met in the early part of March, 1924 (the defendant Guess not being present), and resolved to carry into effect the agreement of May, 1921, to indemnify Guess as nearly as they could. The Sanford, Williams, and Spiers mortgages having been foreclosed, it was agreed that the bank should execute mortgages to Guess upon the lands to which it had acquired title by the foreclosure sales. Accordingly, on March 16, 1924, after an unaccountable delay of nearly three years, the bank executed its note for $56,000.00, payable November 1, 1924, with interest from date at the rate of 4½ per cent. per an-

num; to secure the payment of this note, at the same time the bank executed three several bonds, one for $19,835.90, another for $7,843.92, and the third for $2,756.74, and secured them, the first by a mortgage of the Sanford property, the second by a mortgage of the Williams land, and the third by a mortgage of the Spiers land; at the same time it assigned to Guess as collateral to the $56,000.00 note a bond and mortgage which it held, given by Leda K. Mayfield, the amount unpaid upon which was $31,826.03. These securities were deposited by Guess among his other papers in the bank; the mortgages were not recorded, and, upon the closing of the bank, they were delivered by the receiver to Guess.

Several interesting questions arise in the disposition of the appeal:

(1) Whether Guess, as the beneficiary of a trust *ex maleficio,* became entitled to a preference in the distribution of the general assets of the receivership estate.

(2) If Guess became entitled to such preference, whether he has waived his right as such beneficiary, by accepting the $56,000.00 note of the bank, dated March 16, 1924, secured by the assignment of the Mayfield bond and mortgage and by the bonds and mortgages executed by the bank upon the Sanford, Williams, and Spiers properties.

(3) Whether the assignment and mortgages referred to in subdivision 2 are invalidated by reason of the fact, if it be a fact, that the bank was insolvent at the time of their execution, and that such transaction constituted an unlawful preference?

(4) Whether the mortgages executed by the bank on March 16, 1924, upon the Sanford, Williams, and Spiers properties, are invalid against the claims of subsequent creditors by reason of their nonrecordation?

I. Whether Guess, as the beneficiary of a trust *ex maleficio,* became entitled to a preference in the distribution of the general assets of the receivership estate?

This question arose in the case of *Ex parte Bank of Aynor*, 144 S. C., 147, 142 S. E., 239, 243. In that case the writer of the leading opinion and of this opinion said:

"The authorities are much divided upon this question. Many of them, and we must admit a decided majority of the decided cases, are to the effect that, even in cases of fraudulent misappropriation of trust funds which entered into the assets of an insolvent corporation, the beneficiary of the trust is not entitled to priority over general creditors in the distribution of assets by a receiver, unless he can show that the trust funds have been received by the receiver—he must be able to trace the funds—to establish a *res* upon which the trust may operate. (See extended note upon the subject in L. R. A., 1916-C, 21, particularly at page 53.)

"Other cases from Courts of the highest respectability take a different view, and accord the right of priority in the distribution of the assets of the receivership estate, not upon the ground that assets sufficient to respond to the obligation have reached the hands of the receiver, but that the misappropriated funds have reached the coffers of the corporation before receivership, and have been used for its benefit.

"The minority rule appeals most strongly to our sense of equity and justice. We do not think that the cases which enforce the majority rule draw the very material distinction between an ordinary constructive trust and a constructive trust *ex maleficio*. In the former class of trusts, the title has properly passed to the trustee, and it has very properly been held that one who seeks to impress a trust upon a certain fund must of necessity point out the fund—there must exist the *res* upon which the trust is to be impressed. It is therefore perfectly logical, as held in the cases of *White v. Bank*, 60 S. C., 122, 38 S. E., 453, and *Citizens' Bank v. Bradley*, 136 S. C., 511, 134 S. E., 510, that in cases of receivership the beneficiary must show that funds have come into the hands of the receivership upon which the trust is to be declared. The beneficiary of a simple constructive trust is no

more than an ordinary creditor, except where he can point to a fund in the hands of the receiver upon which his asserted trust is to operate. Otherwise, to allow the trust would grant him a preference over other creditors who possess an equity equal to his.

"But the case is quite different from a constructive trust *ex maleficio*. There the trustee has acquired no more title to the misappropriated fund than a thief would have acquired. As a matter of law and morals he occupies that detestable position; and the beneficiary occupies a much more favorable position than that of the general creditors or the beneficiary of a simple constructive trust. If it can be shown, therefore, that the misappropriated fund went into the coffers of the corporation prior to receivership, was disbursed by the corporation in the payment of its debts or in the acquisition of property, there can be no reason or justice in allowing the general creditors to receive the benefit of the stolen property, simply for the reason that a corresponding amount of money was not turned over to the receiver. The corporation will have received the benefit of the stolen fund by the reduction *pro tanto* of its liabilities; the general creditors should not be heard to say that they may hold onto the benefit of the theft and not account for it."

In that view Mr. Justice Stabler concurred; Mr. Justice Carter dissented, and the Chief Justice concurred in his dissent; Mr. Justice Blease was disqualified; it was accordingly held: "In view of the fact that the Court, composed of four justices, is equally divided upon the right of the bank to preference, that question is left open for future decision. * * *"

The writer of this opinion adheres to the view expressed in the *Aynor case,* and is of opinion that, the trust being one *ex maleficio,* Guess was entitled to a preference in the general assets of the estate, a view which has later been sustained in the case of *Ex parte Hernlen,* 156 S. C., 181, 153 S. E., 133, 69 A. L. R., 443.

However, his Honor Judge Bonham in his decree adopted the view of Mr. Justice Carter, concurred in by the Chief Justice, in the *Bank of Aynor case,* and held that Guess was not entitled to a preference in the general assets of the estate, for the reason that "the proof is that none of the funds arising from the unlawful conversion of his bonds went into the hands of the receiver."

To this ruling there is no exception; but the respondent invokes Rule 4, Subdivision 8, which is as follows: "* * * This Court reserves the right to sustain any ruling, order or judgment upon any grounds appearing in the record," and insists that he should be given the benefit of the law declared in the *Aynor* and *Hernlen cases.* His Honor the Circuit Judge did not in his result hold that Guess was entitled to priority as the beneficiary of a trust *ex maleficio* and his judgment did not grant relief upon that ground. It does not seem proper, therefore, to attempt to sustain a ruling which he did not make upon a ground which he repudiated.

II. If Guess became entitled to such preference, has he waived his right as such beneficiary by accepting the $56,-000.00 note of the bank, dated March 16, 1924, secured by the assignment of the Mayfield bond and mortgage and by the bonds and mortgages executed by the bank upon the Sanford, Williams, and Spiers properties?

A discussion of this issue is unnecessary in view of the foregoing; though it may be observed that there is strong ground for sustaining the waiver under the circumstances. Guess learned as early as May, 1921, of the unauthorized abstraction. His listlessness after the discovery is incomprehensible, and his complacent confidence in the promise of Wiggins to restore the bonds or to pledge securities therefor indicates a ratification of the conduct of Wiggins; at least it indicates no dissatisfaction therewith. This condition was allowed to continue until a part of the abstracted bonds had been sold by the bank to which it had been pledged.

Then Guess secured from the directors a promise to pledge the mortgages upon the Sanford, Williams, and Spiers' properties and the Mayfield mortgage. That was in August, 1923, and still nothing was done until March, 1924, when the condition of the bank showed no improvement, and insistence was made for a consummation of the agreement of August, 1923. When he took from the bank the note of $56,000.00 secured by the assignment and mortgages .on March 16, 1924, he thereby ratified the abstraction and waived his position as the beneficiary of a trust *ex maleficio*.

III. Whether the assignment and mortgages referred to in subdivision 2 are invalidated by reason of the fact, if it be a fact, that the bank was insolvent at· the time of their execution, and that such transaction constituted an unlawful preference.

There can hardly be any question but that the bank was utterly insolvent in March, 1924, when the securities were given to Guess. Its capital stock was $50,000.00 and its alleged surplus $12,000.00; no loan could therefore lawfully be made in excess of 10 per cent., $6,200.00. The bank examiner's report in 1921 shows six loans in excess of that amount and four others perilously near it, the ten aggregating $102,941.30.

In February, 1924, just before the delivery of nearly $54,000.00 of the bank's securities to Guess, these same loans, dating back to 1921, were not only still outstanding and unpaid, but had greatly increased; the capital stock of the bank had been impaired; and its financial condition had steadily grown worse.

The statement, at the time the bank closed, shows that all ten of the loans outstanding in 1921 were still outstanding, was largely increased, and in excess of the $6,200.00 limit; they then amounted to $154,917.08.

The report of Mr. Fant shows a number of other worthless loans ʾand overdrafts. Comparatively little has been realized by the receivers upon such excessive loans, or upon

other worthless loans, and overdrafts, thus indicating such "receivables" were practically worthless as assets of the bank. To such losses must be added the liability to Guess for his Liberty bonds amounting to $56,000.00, making actually over $200,000.00 of losses, about four times the capital stock and surplus of the bank.

This condition had continued since about 1920. President Riley and Director Faust testified that, after 1920, very few loans were made; and the record shows that the large and excessive loans above referred to, and which brought about the downfall of the bank, had been running since 1920.

Accordingly, there can be no question that the bank had lost more than its capital stock and surplus in 1920, and that conditions grew worse from year to year; so that, when the bank gave Guess the securities in 1924, the bank was hopelessly insolvent, and both Guess and his son, who were directors, could not help knowing of this condition.

The Circuit Judge in his decree holds that the mortgages and assignments were executed for a present fair consideration. This is an error, because the liability upon the bonds owned by Guess undoubtedly accrued when such bonds were used in 1920, or when sold in 1923 by creditor banks at least; hence it could not be said in face of these undisputed facts that the consideration moving the delivery of the securities to Guess in 1924 was a present one and of that date; on the other hand, such securities were given undoubtedly to secure an obligation that had arisen three or four years prior thereto.

Under this state of facts the rules and principles of law stated in the case of *Rice v. Columbia,* 143 S. C., 516, 141 S. E., 705, 712, are applicable: "The undisputed testimony establishes that at the time (of the transfers), the bank was, and had been for some time prior thereto, insolvent."

"No rule of equity appeals more to the judicial conscience than that which requires the assets of an insolvent corporation to be distributed ratably among creditors." *Livingstain*

*v. Bank,* 77 S. C., 305, 57 S. E., 182, 184, 22 L. R. A. (N. S.), 442, 122 Am. St. Rep., 568.

"At the moment of insolvency of the bank substantial justice, which in this case is that equality which equity always seeks to enforce, required ratable distribution of the assets." *Ex parte Berger,* 81 S. C., 255, 62 S. E., 249, 253, 22 L. R. A. (N. S.), 445.

"The assets of an insolvent bank are a trust fund for the payment of its creditors, whether as guarantees, bill holders, depositors, or otherwise, and if there is no lien on the fund, the distribution among the creditors must be *pari passu.*" *Dabney v. Bank,* 3 S. C., 124.

When a banking corporation becomes insolvent, the assets become impressed with a trust in the hands of its managing officials to be ratably distributed among all creditors, subject to liens, if any, and as declared by our Court: "This is so manifestly just and right as to appeal instantly and most strongly to the conscience of a chancellor." *Rice v. Columbia, supra.*

"He who claims a departure from this rule must establish his right clearly." *Bank v. Bradley,* 136 S. C., 515, 134 S. E., 510, 511.

It is undisputed that Guess had no lien upon any of the assets of the bank prior to March, 1924—the promise to give him security for the use of his bonds could not constitute a lien; if the bank was insolvent in March, 1924, no valid lien could be given to Guess or any other creditor.

It is immaterial whether or not Guess knew of the insolvency of the bank when the securities were given to him; the invalidity of such transfers depends, not upon the knowledge of the transferee, but upon the fact of insolvency of the bank.

As this Court states the matter, quoting from a high authority in another state, *Dutcher v. Bank,* 1 Thomp. & C. (N. Y.), 400: "The invalidity of a

transfer by an insolvent bank does not depend upon the knowledge of the transferee, but upon the fact of insolvency." *Rice v. Columbia, supra; Dutcher v. Bank,* 1 Thomp. & C. (N. Y.), 400.

The officers and directors of the bank in question, including Guess, were trustees of the assets of the institution for the benefit of all creditors, who were entitled to distribution ratably. Some of the trustees could not transfer some of the assets of the bank to a fellow trustee in order to save him from loss due to the impending calamity.

The force of this proposition in the present case is strengthened by the fact that the record discloses that the officers and directors of the fated bank were either kinsmen, close family connections, or business associates, perhaps with one or two exceptions, of the transferee, Guess.

Consequently, in view of the evidence, measured by the applicable rules of law, the Court would be constrained to hold that Guess had no lien prior to 1924, and that the attempted transfer of the Mayfield mortgage and the execution of the real estate mortgages 'as security for the bank's indebtedness are both invalid, as the bank was at the time of the attempted transfer insolvent, and Guess, together with the other directors, had become trustees of the assets of the institution for the benefit of the creditors thereof. *Rice v. Columbia, supra; Wyman v. Bowman* (C. C. A.), 127 F., 257; *Richardson v. Green,* 133 U. S., 30, 10 S. Ct., 280, 33 L. Ed., 516.

The general principle upon which a preference was allowed in the case of Bank of Aynor was that the cash assets of the American Bank were "swelled" to the extent of the money received from the County notes just three days before closing, and that presumptively such funds were still assets in the hands of the closed bank. *Bank v. Bradley,* 136 S. C., 523, 134 S. E., 510.

Accordingly, the mortgages in the hands of Guess are invalid as liens. Of course, as a creditor for the amount of his Liberty Bonds, he will share ratably

with other creditors of the bank, and would receive about one-fourth of the amount, as he is a creditor in that proportion; but he ought not to be allowed under the facts in this case to receive practically all of the assets of the bank in preference to the other creditors thereof.

When the bonds were sold by the banks which held them as collateral, and returns thereof made to the Bank of Denmark the matters were handled by the bank in a most extraordinary manner, the purpose of which it is difficult to understand. The simple and natural handling of the transactions would appear to have been (as the Palmetto National Bank, for instance, already had upon the account of the Bank of Denmark with it, a credit of the amount of the note negotiated) to increase the credit by the accumulated interest, and charge the Palmetto Bank with the proceeds of the sale of the bonds. If they exceeded the amount of the note and interest, there would be a credit balance in favor of the Bank of Denmark; and so with each of the other two banks. The financial statement would then appear showing the liabilities of the bank diminished by the amount of the note and the assets increased only by the difference, the obligation of the bank for the value of the abstracted bonds to Guess, remaining as a liability of the bank. This liability does not appear ever to have been carried as such in the statements of the bank. Instead of doing this, it appears that in the settlement with the Palmetto Bank the Bank of Denmark entered to its credit upon its "individual ledger" the amount of the proceeds of the sale, $24,760.41; in the settlement with the Hanover National Bank, the Bank of Denmark entered to its credit, upon its "individual ledger," the amount of the proceeds of the sale, $26,136.32; and in the settlement with the Charleston Bank the Bank of Denmark entered to its credit, upon its "individual ledger," the amount of the proceeds of the sale, $6,315.42; the total of these credits is $57,212.15. How this can be treated as an asset of the bank in order to reduce its liabilities is incomprehensible.

IV. Whether the mortgages executed by the bank of ■ March 16, 1924, upon the Sanford, Williams and Spiers properties, are invalid against the claims of subsequent creditors by reason of their nonrecordation.

The mortgages were never recorded, but were taken out of the bank after its closing and delivered to Guess. Our statute provides that a mortgage of real estate must be recorded in order to affect the rights of subsequent creditors. Section 5312, Vol. 3, Code of Laws of 1922.

Were there any creditors of the Bank of Denmark, whose claims accrued after March 16, 1924, when the mortgages were given? The audit made of the bank at its closing shows that it had collected cash items for correspondents aggregating $4,202.64, upon the dates and for the concerns hereinafter stated:

April 11, 1925, First National Bank, Charleston, S. C.......................................$ 241.21

April 11, 1925, Georgia Railroad Bank, Augusta, Ga. ....................................... 176.25

April 11, 1925, Savannah Bank & Trust Co., Savannah, Ga............................... 739.17

April 2, 1925, Savannah Bank & Trust Co., Savannah, Ga............................... 954.00

April 15, 1925, Savannah Bank & Trust Co., Savannah, Ga............................... 1,325.22

April 11, 1925, Southern States Phosphate & Fertilizer Co., Augusta, Ga............... 268.42

April 8, 1925, Southern States Phosphate & Fertilizer Co., Augusta, Ga............... 269.22

April 9, 1925, Southern States Phosphate & Fertilizer Co., Augusta, Ga............... 229.16

$4,202.64

Undoubtedly these constituted creditors subsequent to the unrecorded mortgages of Guess, dated March 16, 1924.

An examination of the individual accounts of depositors upon the ledger sheets of the bank shows that depositors of the bank are subsequent creditors to the amount of $58,687-.00, showing subsequent creditors' claims to the amount of $62,889.64.

We agree, with the following modification, in the result of the conclusions arrived at by Mr. Justice Cothran: In the light of the facts of the case, the view may reasonably be reached that Guess, either by consenting or by subsequent waiver of any objection, made a loan of his bonds to the Bank of Denmark to be used by it as collateral for borrowing purposes. Under such circumstances, if the bank had not become insolvent but had redeemed the bonds, Guess would have been entitled to have them returned to him. It can hardly be denied, therefore, that, when the bonds were sold by the banks holding them as security, he was entitled, after the payment of the loans for which they were pledged, to receive from the proceeds of sale any sums in excess of the amounts of such loans.

It appears from the record that the three banks from which the Bank of Denmark secured the loans for which the bonds were pledged as security realized from their sale, in the aggregate, $9,512.15 more than the total amount of the loans, and that this difference was paid to and received by the Bank of Denmark and appropriated by it to its own use. Under these conditions, that amount was impressed with a trust *ex maleficio* in favor of Guess, and he is entitled to a preference to that extent in the distribution of the bank's assets. As a creditor for the remaining amount of his Liberty bonds, he will share ratably with other creditors of the bank.

The judgment of the Circuit Court is modified as herein indicated, and the case is remanded to that Court for further proceedings consistent with this opinion.

Mr. Chief Justice Blease, and Mr. Acting Associate Justice C. T. Graydon concur.

Mr. Justice Carter disqualified.

ORDER ON PETITION FOR AMPLIFICATION OF OPINION
*Per Curiam.*

The respondent Guess has presented a petition asking that the Court's opinion in this case, filed February 11, 1932, be amplified in the following particulars: (1) By stating whether the petitioner is entitled to interest on the sum of $9,512.15, allowed him as a preference, and, if so, in what amount; and (2) by stating whether the petitioner is entitled to share in the assets of the bank as a deposit creditor or as a general creditor.

As to the first question, it appears that the bank placed to the account of Guess interest on the amount of his bonds at the rate of 4¼ per cent., and that he accepted same. The Court, therefore, concludes that he is entitled to the interest on $9,512.15 from the date of the appointment of the receiver only, at the highest rate the receiver may have realized upon his investment of that amount of money.

With respect to the second question, in view of the finding of the Court that Guess made a loan of his bonds to the Bank of Denmark, either by consenting or by subsequent waiver of any objection, to be used by it as collateral for borrowing purposes, it does not appear that he was a depositor in any sense of the word, and that therefore he should file his claim for the remaining amount of his Liberty bonds as a general creditor and not as a deposit creditor.

It is therefore ordered that the following paragraph of the opinion:

"It appears from the record that the three banks from which the Bank of Denmark secured the loans for which the bonds were pledged as security realized from their sale, in the aggregate, $9,512.15 more than the total amount of the loans, and that this difference was paid to and received by the Bank of Denmark and appropriated by it to its own use. Under these conditions, that amount was impressed with a trust *ex maleficio* in favor of Guess, and he is entitled to a preference to that extent in the distribution of the bank's

assets. As a creditor for the remaining amount of his Liberty bonds, he will share ratably with other creditors of the bank," be stricken therefrom, and the following substituted therefor: "It appears from the record that the three banks from which the Bank of Denmark secured the loans for which the bonds were pledged as security realized from their sale, in the aggregate, $9,512.15 more than the total amount of the loans, and that this difference was paid to and received by the Bank of Denmark and appropriated by it to its own use. Under these circumstances, that amount was impressed with a trust *ex maleficio* in favor of Guess, and he is entitled to a preference in the distribution of the bank's assets to the extent of the sum of $9,512.15, with interest thereon from the date of the appointment of the receiver, at the highest rate the receiver may have realized upon his investment of that amount of money. As a creditor for the remaining amount of his Liberty bonds, he will share ratably with the other general creditors of the bank."

With this amplification, the opinion filed February 11, 1932, stands as the judgment of the Court.

And it is so ordered.

MR. CHIEF JUSTICE BLEASE, MR. JUSTICE STABLER, and MR. ACTING ASSOCIATE JUSTICE C. T. GRAYDON concur.